658 So.2d 272 (1995)
In the Interest of J.L.N.
No. 27,568-JA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1995.
*273 Northwest Louisiana Legal Services by Gary M. Skeen, Shreveport, for appellant, K.V.N.
James T. Adams, Bossier City, for appellee, Mrs. Snider.
Before MARVIN, BROWN and STEWART, JJ.
MARVIN, Chief Judge.
This private action to terminate the parental rights of the mother and the alleged father of J.L.N., born to the unmarried 17-year-old mother, K.V.N., in February 1992, was brought by Charlene Snider, who has cared for the child, a boy, without state intervention or assistance since December 1992. Mrs. Snider, who is not related to either parent, filed the action against the parents with court approval as authorized by Ch.C. Art. 1004. The Department of Social Services was served with notice of the filing *274 of the petition but has not been made a party to the action. The attorney who was appointed by the trial court to represent the child participated in the proceedings before and during the trial but has not filed a brief in this court.
After a two-day hearing that began on November 30, 1994, when the child was almost three years old, the trial court terminated the rights of both parents. The mother appeals, and Mrs. Snider has answered her appeal. The judgment against the father was not appealed and is now final.
The primary issue raised on appeal is whether the trial court erred, legally or factually, in terminating the mother's rights under Ch.C. Art. 1015(3), which applies when
(a) The conduct of the parent, either as a principal or accessory, constitutes abuse, neglect, or cruel and inhuman treatment or grossly negligent behavior which is below a reasonable standard of human decency [and]
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of [her] reformation in the foreseeable future. (Our emphasis and brackets.)
The trial court found that the mother had not "abused or neglected" the child under Art. 1015(3), nor abandoned him under Art. 1015(9), as Mrs. Snider also alleged. The court concluded, however, that the mother's pattern of passive conduct with respect to the child, namely, her having left him with various "sitters" for increasingly long periods of time without notifying them of her whereabouts, and her failure to establish or maintain a stable job and place of residence for herself and the child over a period of several years after his birth, even while others were caring for the child at their own expense "until she could get back on her feet," constituted "grossly negligent behavior" and demonstrated her "unfitness" and the unlikelihood of her reformation under Art. 1015(3).
Mrs. Snider's answer to the appeal urges clear error in the trial court's finding that the mother did not abandon the child under Art. 1015(9).
On the specific facts of this record, we affirm the judgment.

FACTS
We review and summarize the evidence in the light that most favorably supports the trial court judgment. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993); Harrison v. Myers, 25,902 (La.App. 2d Cir. 6/22/94), 639 So.2d 402.
The child's mother, Kelly, was living in Rockwall, Texas, near Dallas, with her boyfriend, Ronnie, when she became pregnant in the spring of 1991, at the age of 16. She was estranged from her own mother, who also lives near Dallas. Before moving in with Ronnie, she took care of her younger sister at the residence of her former stepfather, who was seldom home, according to Kelly.
Kelly originally planned to marry Ronnie but did not because he "had an attitude." Instead, she returned to Shreveport, where her father and other relatives live, and stayed with her father, her aunt and various members of her church for periods of a month or so at a time until her son was born on February 25, 1992. Kelly was then 17 years old and a junior in high school.
During Kelly's pregnancy, several church members with whom she lived for brief periods expressed to her their concern about her ability to support herself and the child, considering her age, her limited education and her lack of income. Kelly briefly considered allowing a couple from church, the Bickhams, to adopt the child, but ultimately decided against adoption. She also declined the youth pastor's suggestion that she seek help from a church-affiliated program for young unwed mothers in Monroe.
Shortly after the child's birth, Kelly began leaving him with members of her church who had offered their help as "baby-sitters." Kelly initially left the child with a sitter for short periods of time, such as an afternoon, a day, or occasionally overnight, and picked him up at the agreed-upon time. She soon began leaving him with a sitter for several days at a time and became less reliable about picking him up. Kelly had no phone or fixed *275 place of residence where the sitters could reach her while the child was with them.
According to the sitters, the only reason Kelly gave for needing their services was that she was "going out" or "just having fun with a guy friend." When Kelly picked the child up from a sitter, she generally kept him for only a day or so before leaving him with another sitter for several days.
Kelly attended high school occasionally, but not regularly, in the spring of 1992. During the summer, she worked for about a month at McDonald's. She said she quit that job because "they [weren't] paying her enough" for the work she was doing.
Kelly usually furnished the sitters with baby formula, which she received from the state at no charge, but often brought the child to them clothed only in a diaper, even in cold weather, and in need of a bath. The child's diaper was sometimes "filthy," according to one of his regular sitters, Mrs. Judd, who said the child frequently had diaper rash. The sitters, and not Kelly, bought clean diapers for the child.
Another regular sitter, Mrs. Usie, testified that the child was frequently sick. On one occasion when the child had fever, Mrs. Usie took him to the doctor after trying unsuccessfully to locate Kelly, but was unable to obtain medical treatment without the mother's authorization. Mrs. Usie described other times when she tried to contact Kelly to pick up the child and was unable to locate her at the homes of various relatives with whom she claimed to be staying. Mrs. Usie eventually "gave up" on trying to reach Kelly, saying, "I just had to wait until she called me. So thankfully nothing happened to the baby [while Kelly's whereabouts were unknown]."
Mrs. Usie and her husband sympathized with the plight of the young unemployed and unstable mother, whose family obviously offered her little or no support. The Usies invited Kelly and her infant to live in their home, "to help her get on her feet." Initially believing that Kelly "was trying to get her life right because she went to church," Mrs. Usie soon learned that she had several boyfriends and claimed to be unsure who the child's father was. When Mrs. Usie mentioned the possibility of putting the child up for adoption, Kelly said she would not do that.
In response to Mrs. Usie's offer to help her find a job, Kelly said she already had a job at a "tanning salon." After only a few days' work, Kelly came home with "new clothes and ... lots of ... cash," according to Mrs. Usie, who visited the salon and met others who worked there. Sensing that "something wasn't right," Mrs. Usie contacted the sheriff's office to inquire about the salon. Mrs. Usie testified that when she confronted Kelly with information that prostitution was taking place at the salon, Kelly "admitted ... they [others who worked there] did [it] ... but [said] that she didn't know about it and that's why she quit."
Based on Kelly's conduct, and on her own fear of becoming too attached to the child emotionally if the mother and child continued to live in her home, Mrs. Usie asked Kelly to find another place to stay with the child after they had lived in her home for about two weeks. Mrs. Usie continued to baby-sit the child thereafter, but did so less frequently than in earlier months.
In the fall of 1992, Kelly began her senior year of high school. She and the child lived with her male cousin, Donnie, who helped transport the child to and from various baby-sitters during the week, while Kelly attended school and Donnie worked. Both Donnie and Kelly testified the child was at home with his mother at night. Donnie admitted, however, that he spent very little time at home, explaining that he was using "a lot of drugs" at the time. He did not use drugs at home, and said Kelly did not use drugs at all.
Around Thanksgiving 1992, Kelly began dating a friend of Donnie's who also used drugs. Kelly and her boyfriend, Shane, began living together almost immediately, in the home of one of Shane's relatives.
On an unspecified weekday in early December 1992, Kelly left the child, who was then sick, with a teenage girl from the church. Kelly said she left the child's medication with the young sitter, Candy, who did not testify at trial. Mrs. Usie, however, said *276 Candy called her later that evening, "scared to death, because the baby was sick at her house ... [and she] didn't know what to do with him." Mrs. Usie picked the child up from Candy's home, borrowing an adult-size blanket to cover the child who was clad only in a diaper.
Mrs. Usie had out-of-town company at the time, and could not keep the child herself, but made arrangements with the plaintiff, Mrs. Snider, a fellow church member, to keep the child for the weekend. Mrs. Snider, who did not then know Kelly, bathed the child, borrowed some baby clothes for him, and gave him over-the-counter medication recommended by a nurse friend. Mrs. Snider kept the child for a few days and returned him to Mrs. Usie on Sunday. Kelly picked the child up from Mrs. Usie that evening.
Both Mrs. Snider and Mrs. Usie testified that the young sitter, Candy, was mentally "slow" and unable to properly care for an infant, even one who was not sick.
Mrs. Snider and her husband, who have two teenage children of their own, met Kelly soon after the child's first stay with them. Mrs. Snider offered to baby-sit the child again, advising Kelly that she should not leave the child with Candy.
Kelly called Mrs. Snider a few days later, asking her to baby-sit on a weekday. Mrs. Snider, who works during the day, initially told Kelly she could not keep the child that day, but relented when Kelly said her "only other choice" was to leave him with Candy. That evening, Kelly called to ask if the child could stay for "a few days longer." Mrs. Snider agreed, keeping him until Sunday evening. Friends assisted her in caring for the child during her work hours.
The following Tuesday, Kelly returned the child, who was again sick, to Mrs. Snider. After making arrangements for a friend to keep the child during the day, Mrs. Snider went to work. Around 10:00 a.m., she received a call from her friend, who reported that the child was "very sick." Mrs. Snider left work, picked up the child, and called Kelly to inform her of the child's condition and need for medical care. Kelly did not have a car, so Mrs. Snider picked her up from the residence she shared with her boyfriend, Shane, and drove to a nearby hospital, where the child was treated for bronchitis.
Kelly called Shane for a ride home from the hospital. When he arrived, Kelly told Mrs. Snider that the couple "had plans" for the night, and asked if she would keep the child until the next day. Kelly offered Mrs. Snider the use of her Medicaid card to get the child's prescriptions filled at no cost.
Mrs. Snider agreed to keep the child overnight. Kelly did not pick him up the next day, however, but came by two days later and brought Mrs. Snider some diapers, baby formula and cereal. Mrs. Snider continued to keep the child, and apparently did not hear from Kelly again until Christmas Day, when she took the child for about 1½ hours and then returned him to the Sniders.
Before Christmas, Mrs. Snider had contacted the child protection division of the Department of Social Services to report that the child's mother often left him with "baby-sitters" for long periods of time without informing them of her whereabouts, even when he was sick. Mrs. Snider asked the DSS agent whether she and her husband could be named the child's foster parents, but took no action toward formalizing the arrangement after being told that the state could not guarantee placement of the child in their home.
The Sniders became the child's primary caregivers, albeit informally, early in 1993, enrolling him in a day-care program and providing virtually all of his support, other than an occasional box of diapers, pair of shoes or outfit of clothing that Kelly belatedly began to furnish. At Mrs. Snider's request, Kelly signed a document giving Mrs. Snider authority to obtain medical treatment for the child.
DSS investigated Mrs. Snider's December 1992 report of the mother's lack of supervision, but closed its file in February 1993, when the child's father, Ronnie, and his wife took the child to their home in east Texas, telling Mrs. Snider and DSS that Kelly had agreed for them to raise the child there. After turning over the child's personal belongings *277 to the father and stepmother, Mrs. Snider learned from Kelly that she had not agreed to relinquish custody to the father. Mrs. Snider accompanied Kelly to Texas to retrieve the child. The father returned some of the child's belongings, but did not return the clothes Mrs. Snider had furnished. He had little contact with the child thereafter.
At the time of this exchange, and unbeknownst to the mother, Mrs. Snider, and DSS, the child's father was under indictment in Texas for sexually abusing a young girl. The father later pleaded guilty to the charge and was placed on probation, according to this record.
Upon the child's return from Texas, apparently in late February 1993, he stayed with Kelly and her boyfriend, Shane, for about a week. Kelly testified that she intended to keep the child for more than a week but became concerned about his safety when Shane hit the child. Shane had physically abused Kelly during their three-month relationship.
After Shane hit the child one time, Kelly asked Mrs. Snider to keep the child again, but did not then tell Mrs. Snider about Shane's abusive conduct toward her or toward the child. Kelly explained:
At that time [February 1993] I realized that I couldn't have [the child] around Shane and living in that kind of environment.
That the best place for him at that time was with [Mrs. Snider]. And that way it would give me enough time to get my life together and figure out a way to get away from [Shane] myself....
I tried to leave him several times [after he hit the child] and I couldn't ... [b]ecause he would ... find me and [the violence would get] worse and worse....
The [police have come out] many many times with Shane, apparently, but he has always talked his way out of it. And they never did anything to him.
Notwithstanding these incidents, Kelly continued to live with Shane for another year, until March 1994. Some of her relatives and friends knew that Shane abused Kelly, but Mrs. Snider did not. Kelly did not seek any outside help to get away from the abuse.
In the spring of 1993, Kelly received about $2,000 as a lump-sum payment of past-due social security benefits resulting from her father's disability. She used the money to buy a car, which Shane later vandalized in one of his fits of rage when she tried to leave him. She attended high school for a few months, receiving about $300 in monthly benefits while she was in school, even after she turned 18. The benefits ended when she quit school before completing her senior year.
Kelly apparently worked for only a few months in 1993, at a Texaco service station-convenience store. Her testimony that she held this job for "almost a year," from roughly October 1992 until October 1993, is at odds with her other testimony and is not corroborated by other evidence. Her testimony appears to be exaggerated, as were many of her time estimates. Kelly gave no reason for leaving the Texaco job. She did not attempt to work again until March 1994.
Shane admitted under oath that he and Kelly regularly smoked "crack," or rock cocaine, throughout their relationship, but said Kelly did not use drugs in the child's presence. Kelly categorically denied ever having used drugs, and said Shane never did so in her presence.
During her relationship with Shane, Kelly's pattern of changing her residence at short intervals continued. From December 1992-March 1994, for about 16 months, the two moved roughly once every two months, occasionally renting a trailer but usually staying with relatives or friends rent-free.11 Their longest stay in one place was for five months, in a rented trailer, and ended with eviction for failure to pay rent. They contributed nothing toward their room and board when they stayed with people they knew. The record indicates that either or both Kelly and Shane forged and cashed checks belonging to several of the people they lived with for brief periods, to support his or their drug habit.
After Kelly returned the child to the Sniders in February 1993, she visited him briefly once or twice a month and occasionally *278 took him on short outings, returning him to Mrs. Snider with no signs of abuse or neglect. Kelly's exact whereabouts at given times were not revealed to Mrs. Snider, who had difficulty contacting her.
In July 1993, Mrs. Snider tried to reach Kelly at various residences, and at the place she claimed to be working, to tell her that the Sniders would be vacationing in Canada for two weeks in August. Mrs. Snider did not want to leave the U.S. with the child, having no formal custody or guardianship agreement. She testified that she intended to ask Kelly to keep the child while her family vacationed, but was unable to locate Kelly over a period of several weeks. The Sniders took the child to Canada and, as expected, had difficulty explaining to Customs officials why they were traveling with the child, over whom they had no documented legal rights.
Kelly's recollection of the Canada incident was that Mrs. Snider asked for her permission to take the child on vacation with her family and Kelly agreed.
Notwithstanding her admittedly "unorthodox" lifestyle, Kelly has maintained brief and sporadic contact with the child and with Mrs. Snider, but rarely had the child in her custody for more than a day or so at a time during the two years the child remained with the Sniders.
The relationship between Kelly and Mrs. Snider was generally cordial and cooperative until March 1994, when Kelly asked Mrs. Snider on Good Friday if she could take the child "for a few days," saying she had broken up with Shane and wanted to bring the child to Dallas to meet the family of her new boyfriend, named Brandon or Brian. Mrs. Snider replied that she had planned an Easter egg hunt for the child and his neighborhood friends on Easter Sunday. Kelly agreed to have the child back in time to participate in the egg hunt.
Kelly did not return the child on Easter Sunday or contact Mrs. Snider. Mrs. Snider learned from others that Kelly had taken the child to Tyler instead of Dallas. The relative with whom Kelly usually stayed in Tyler informed the Sniders that she had recently left his home with the child for an unknown destination, without taking her purse or any clothes for the child.
Concerned for the safety of both Kelly and the child, the Sniders unsuccessfully sought to learn of their whereabouts and condition for about two weeks, contacting Kelly's relatives in both east Texas and in Shreveport. Each declined Mrs. Snider's suggestion to file a missing persons report with the police, saying, "She'll show up."
During the third week after Easter, Kelly reappeared with the child in Tyler, saying she had been "hiding" from Shane, who was angry at her for leaving him. She apparently provided adequate care for the child during her "disappearance." Initially testifying that she worked for a "housecleaning service" during that time, Kelly later said she worked as a live-in nanny for "a woman named Sue" who has an eight-year-old child.
After visiting Kelly and the child in Tyler, some three weeks after Easter the Sniders brought the child back to Shreveport with Kelly's permission. Kelly originally planned to stay in Tyler, where she said she had a job at the local Dairy Queen. Kelly returned to Shreveport a week later, however, telling Mrs. Snider that she was engaged to marry a man named Scottie, with whom she was living, and was planning to go back to school.
Two weeks later, according to Mrs. Snider, Kelly reported that "things didn't work out" with Scottie and that she had resumed her relationship with Shane. This reunion was short-lived. Kelly then moved in with a man she called John, telling Mrs. Snider they were planning to get married. That relationship ended when John began using "crack" with Shane.
By this time, late April or early May of 1994, Mrs. Snider had grave concerns about Kelly's ability to take care of the child on a day-to-day basis. These concerns were exacerbated by a telephone call Mrs. Snider received from a law enforcement officer in Texas who told her he had a warrant for Kelly's arrest. When Mrs. Snider questioned Kelly about this, she replied that she "didn't do anything" unlawful.
*279 Mrs. Snider was unwilling to take Kelly's word on the subject, and feared for the child's welfare if Kelly was indeed arrested while the child was with her. For the first time in their relationship, Mrs. Snider refused to allow Kelly to take the child, notwithstanding Kelly's threat to charge Mrs. Snider with kidnapping. This incident and Kelly's history caused Mrs. Snider to file the termination action on May 26, 1994. The hearing of the action, originally set for July, was continued several times, and did not begin until November 30. Kelly was then 20 years old, had not finished high school, and had worked only sporadically since the child's birth almost three years earlier. During that three-year period, she had changed her place of residence at least 18 times.
While saying there were no outstanding warrants for her arrest, Kelly admitted to having had her driver's license suspended for failing to pay a speeding ticket, but denied ever having used drugs or forging checks. These denials, however, were called into question by the testimony of other witnesses. Kelly admitted she was fired from a telemarketing job she obtained with B & H Industries in 1994 because she physically assaulted her supervisor.
The altercation at work occurred in August 1994. Kelly and her latest "fiancee," Carl, worked in the same office. According to one of Kelly's supervisor, Ms. Patty, the couple often disrupted the office with frequent and heated arguments. Kelly was eventually suspended from work for three days by another of her supervisors, Ms. Crawford, for using vulgar language in the office. She refused to leave the office, however, and began arguing with Ms. Patty, whom she struck in the face when, according to Kelly, Ms. Patty made a remark about the child. Ms. Patty suffered a broken nose, and filed criminal charges against Kelly, who was convicted, placed on probation, and ordered to pay restitution.
After losing her job with B & H in August, Kelly obtained another telemarketing job with a siding contractor in Shreveport but quit in mid-November, a few weeks before the parental rights termination hearing, to move to Amarillo, Texas, where Carl had been transferred in October to manage an office of B & H Industries there. Kelly had already found and started a sales job with American Hydro Systems in Amarillo, intending to return there permanently after the court hearing.
Kelly testified that she and Carl were still engaged but had delayed their wedding date from September 1994 until June 1995, saying they opted for a "big nice church wedding" instead of one before a justice of the peace. Carl did not testify.
No expert testimony was presented at the hearing. The lay evidence does not suggest or show that Kelly has any mental illness or physical disability.
Kelly and Mrs. Snider expressed differing understandings of the expected duration of the child's stay with the Sniders. Kelly testified that after the first time Mrs. Snider kept the child in early December 1992, Mrs. Snider offered to "be his second Mom until I could get on [my] feet," and then return the child to her. Mrs. Snider denied making such a statement, and testified:
Q. Exactly under what terms and conditions did you take this child into your home in December of 1992? Was that ever discussed between you and Kelly?
A. No, sir. Other than I told her that I would baby-sit. We didn't make any long-term plans. We just lived one day at a time.
Mr. Snider corroborated his wife's testimony:
Q. Mr. Snider, under what terms or conditions was this child allowed to remain in your home? What did you understand the conditions and terms to be?
A. There were no conditions or terms. We just took him home, because he was sick and some young girl was watching him and she didn't know what she was doing. And he needed somebody to do something, and we did it.
Q. Did you feel that it was going to be permanent at that time?
A.... I didn't know what was going to happen. We had no idea we'd have him for two years, no.

*280 Q. Over that period of time, has your attitude changed over how long you're to keep the child?
A. Well, after two years, we've become attached to him, yeah. He's family.

TRIAL COURT FINDINGS
At the close of Mrs. Snider's case, the mother's counsel moved for involuntary dismissal of the action, arguing that the evidence did not prove any of the grounds for termination alleged in the petition: desertion or abandonment of the child under Ch.C. Art. 1015(8) and (9), respectively, or abuse, neglect, cruel and inhuman treatment, or grossly negligent behavior under Art. 1015(3). The mother's counsel called the court's attention to Ch.C. Art. 1035, which requires that "grossly negligent behavior" be proved beyond a reasonable doubt, and not merely by clear and convincing evidence, the usual standard of proof in termination actions.
Agreeing that the evidence did not show grounds for termination under Art. 1015(8) or (9), the trial court nevertheless overruled the motion, finding that "under Section 3 of [Art.] 1015, there is a viable cause of action."
After hearing the defense evidence, and prefacing its ruling with the observation that the mother obviously "loves her child and does not want to give him up," the trial court made these findings:
The mother did not desert or abandon the child under Art. 1015(8) and (9).
The mother's conduct "does not constitute abuse, neglect, or cruel and inhuman treatment" under Art. 1015(3).
"[D]espite the mother's good intentions, her past conduct is indicative only of instability and immaturity, and ... it does constitute grossly negligent behavior, which is below a reasonable standard of human decency" under Art. 1015(3).
The mother is now unfit to retain parental control, and there is no reasonable expectation of her reformation in the foreseeable future.
A written judgment repeating the court's oral findings with respect to both parents, and prefaced with the statement that "the evidence presented in favor of termination of all parental rights is clear and convincing" (our emphasis), contains 12 separate decrees, the eighth of which reads: "The conduct of [the mother] constitutes grossly negligent behavior which is below a reasonable standard of human decency."

ARGUMENTS ON APPEAL
The mother's first assignment of error is that the court did not apply the beyond a reasonable doubt standard of proof to the allegations of her grossly negligent behavior under Art. 1015(3), as required by Art. 1035. The mother urges us to review the evidence de novo, without giving the usual deference to the trial court's factual findings.
It appears that the trial court was aware of the heightened standard of proof required for allegations of grossly negligent behavior when it made the initial oral finding of such conduct from the bench, having just been reminded of that standard by the mother's counsel when the motion for involuntary dismissal was made and overruled at the close of Mrs. Snider's case. The written judgment, which refers only to the clear and convincing standard, was apparently prepared by Mrs. Snider's counsel and was approved as to form by the mother's counsel. The clear and convincing standard applies to all other factual findings in the rather lengthy judgment.
From our examination of the record as a whole, we conclude that the more stringent reasonable doubt standard was applied to the allegations of the mother's grossly negligent behavior, and that the omission of a notation to that effect from the judgment was an oversight. In any event, we find that the evidence in the record satisfies the reasonable doubt standard and amend the judgment accordingly.
The mother's contention that the trial court erred by terminating her parental rights on general findings that termination would be in the child's best interest, without also requiring proof of one or more of the specific statutory grounds for termination, is belied by the court's oral reasons for judgment:

*281 [I]t is crystal clear to this Court that the best interest of [the child] would be served by terminating the mother's right[s], so that [the child] would have a chance to continue living in a much more stable and wholesome environment.
That, of course, is not the sole issue before the Court. The issue ... is whether... [the mother's] past conduct has risen to the level under this Section 3 [of Art. 1015] of ... parental mistreatment. (Our brackets.)

ELEMENTS OF PROOF UNDER ART. 1015(3)
The mother next argues that Art. 1015(3), quoted in paragraph three of this opinion, should be read to require proof of the parent's "abuse or neglect and grossly negligent behavior," even though the disjunctive or appears in the article. The mother claims the former statute on this aspect of termination of parental rights, LRS 13:1601(C), required proof that the child was abused or neglected by the parent, and that the abuse or neglect "results from grossly negligent behavior which directly harms the child."
Relying on the comments of the Children's Code Project Committee which preface and appear throughout the Code as evidence of a lack of legislative intent to change the law in this regard, and citing case law allowing disjunctive terms in a statute to be read as conjunctive to accurately reflect the legislative intent, the mother argues for application of the conjunctive here. Her construction of the statute, if correct, would require reversal of the judgment in light of the trial court's express finding that the mother's conduct did not constitute abuse or neglect.
The mother's argument for a conjunctive reading of the elements of Art. 1015(3) was neither made in, nor ruled on by, the trial court. Kelly's motion for involuntary dismissal was founded on assertions that Mrs. Snider did not meet her burden of proving "abuse, neglect, or ... cruel and inhumane [sic] ... treatment ... by clear and convincing evidence, or grossly negligent behavior beyond a reasonable doubt."
We find no legal error in the trial court's implicit construction of the statute as containing disjunctive, rather than conjunctive, elements. We construe the statute in the disjunctive.
The comments to the Children's Code provide little support for the mother's argument, in our view, notwithstanding the committee's general statement in the introductory comments that the overriding purpose of the codification was "to collect and harmonize existing laws." See p. XVI, "The Drafting of the Children's Code." Sweeping reform was not intended, although the titles dealing with voluntary surrender of children for adoption and with families in need of services contain, in the committee's words, "significant revisions." p. XV.
The comments following each article of the Code generally identify the source provisions and affirmatively note when the prior law has been amplified, modified or revised. The comments following Art. 1015 clearly indicate that the prior law on termination of parental rights has been revised in some respects. See, for example, comment (b), noting that the pertinent period for determining a parent's likelihood of reformation under Paragraphs (1)-(5) and (7) is "the foreseeable future," a qualifier which did not appear in the source law.
The mother's counsel emphasizes that the comments following Art. 1015 do not otherwise suggest or note any intent to change the law contained in Paragraph (3), as by substituting the disjunctive or for the conjunctive and in the source provision. Comment (d) simply says: "The source of Paragraph 3 is R.S. 13:1601(A)(2)." Unfortunately, Comment (d) is erroneous. The source provision of Paragraph 3 is actually § 1601(C), which provided:
§ 1601. Petitioning for the termination of parental rights.
The court ... may order ... termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, E, or F of this Section....

*282 C. (1) The abuse or neglect of the child by the parent or parents results from grossly negligent behavior which directly harms the child. [and]
(2) The abuse or neglect of the child by the parent or parents consists of persistent cruel and inhuman treatment which is below any reasonable standard of human decency. [and]
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
Our emphasis and brackets. See State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993); State in Interest of C.V. v. T.V., 499 So.2d 159 (La.App.2d Cir. 1986), writ denied (evidence must prove all elements of at least one subsection of § 1601).
Termination under § 1601(C) thus required proof of abuse or neglect, and grossly negligent behavior which directly harms the child and cruel and inhuman treatment which is below any reasonable standard of human decency.
Compare the wording of § 1601(C) with the present provision, Ch.C. Art. 1015(3):
Art. 1015. Grounds [of involuntary termination]
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
[Paragraphs (1) and (2) deal with criminal conduct against the child who is the subject of the termination proceeding, or another child of the parent.]
(3) Other parental mistreatment
(a) The conduct of the parent, either as a principal or accessory, constitutes abuse, neglect, or cruel and inhuman treatment or grossly negligent behavior which is below a reasonable standard of human decency.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future. (Our emphasis and brackets.)
Art. 108 of the Children's Code provides that the word "and" indicates the conjunctive, and the word "or" indicates the disjunctive, unless the context clearly indicates otherwise. (Our emphasis.)
Had the legislature intended to use the conjunctive rather than the disjunctive in Art. 1015(3), as the mother suggests, it could have simply reenacted the existing provision without change. When the legislature words a new law differently from its source provision, an intent to change the law is presumed. State v. Wilson, 204 La. 24, 14 So.2d 873 (1943); State ex rel. Board of Com'rs v. Bergeron, 235 La. 879, 106 So.2d 295 (1958).
The cases applying this presumption are more analogous to the situation before us than are Gay v. United Benefit Life Insurance Company, 233 La. 226, 96 So.2d 497 (1957) and Irving v. U.S. Fidelity & Guar. Co., 606 So.2d 1365 (La.App.2d Cir.1992), which the mother cites as authority for replacing the word "or" in a statute with "and," to accurately reflect the legislative intent. Gay involved the initial codification of insurance law derived from the jurisprudence, and not from a prior statute enacted by the legislature. Irving is simply a recent reiteration of Gay's interpretation of the codification in LRS 22:619.

WHAT IS "GROSSLY NEGLIGENT BEHAVIOR"?
Art. 1015(3) of the Children's Code refers to four types of behavior: abuse, neglect, cruel and inhuman treatment, and "grossly negligent behavior which is below a reasonable standard of human decency." The first two terms are defined in Art. 1003; the others are not.
The term "abuse" is generally defined as conduct which either causes or allows physical, mental or emotional injury to a child. Art. 1003(1). "Neglect" is defined as "the refusal or failure of a parent ... to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health is substantially threatened or impaired." Art. 1003(8). Our emphasis.
The term "crime against the child," which appears in Art. 1015(1) and (2) as one of the *283 elements for terminating the parental rights of a parent who has been convicted of, or who has committed, such a crime, includes criminal neglect. Art. 1003(4)(g). The Criminal Code defines "criminal neglect" of a child as "the desertion or intentional nonsupport... [b]y either parent of his minor child who is in destitute or necessitous circumstances[.]" LRS 14:74.
When a petition for termination of parental rights alleges facts constituting criminal conduct under Article 1015(2) or grossly negligent behavior under Article 1015(3), such facts must be proven beyond a reasonable doubt. Other grounds for termination must be proven by clear and convincing evidence. Ch.C. Art. 1035.
We deduce from these provisions that the term "grossly negligent behavior" was intended to mean behavior which exceeds ordinary negligence and which approaches criminal negligence.
By criminal standards, "negligence" is defined as "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances... although neither specific nor general criminal intent is present[.]" LRS 14:12. As we said in State v. Wilcoxon, 26,126 (La. App.2d Cir. 6/22/94), at p. 2, 639 So.2d 385, 388:
Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring that the accused intend some consequence of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions.
The term "gross negligence" is also "essentially negative" in the context of the civil law, having been variously defined as
the want of even slight care,
utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others,
reckless disregard of, and extreme departure from, ordinary care, and
careless indifference.
See these and other definitions of the term in Ambrose v. New Orleans Police Amb. Serv., 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, and Rosenblath's v. Baker Industries, 25,685 (La.App.2d Cir. 3/30/94), 634 So.2d 969, writ denied.
Synthesizing these definitions, we conclude that the term "grossly negligent behavior which is below a reasonable standard of human decency," in the context of Ch.C. Art. 1015(3), means a parent's careless indifference to the basic needs of his or her child and the utter disregard of the consequences of that indifference, which rises to a degree that is a gross deviation below the standard of care required of a reasonable parent. As with the statutory definition of simple "neglect," the parent's conduct may be found lacking if it causes or threatens harm to the child.
The parent's indifference and utter disregard of the consequences of that indifference may rise to the degree of gross negligence notwithstanding that the child's needs happen to be met by others who act in place of the absent and indifferent parent. In extreme circumstances such as these, the parent's utter disregard of his or her responsibilities to the child may be said to threaten harm to the child even though no harm is actually caused.
Applying these principles to the facts in the record, we conclude beyond a reasonable doubt that the mother's conduct with respect to her child constitutes grossly negligent behavior which is below a reasonable standard of human decency.
Throughout this child's life, the mother has functioned more as a casual observer or infrequent "sitter" than as a parent, seeing the child only rarely, sporadically and for relatively short intervals, absenting herself without revealing her whereabouts. She has left the more difficult, time-consuming and demanding job of "parenting" the child on a daily basis to good-hearted more mature adults such as the Sniders.
This role reversal involves a mother, who has not been shown to be physically or mentally impaired, and who denies ever having *284 used drugs, yet who has made no appreciable effort to maintain contact with the child or to establish a home or means of sustenance for herself and her child. She has left the child with sitters when he was sick, dirty and virtually unclothed except for a dirty diaper, repeatedly making her social "plans" and "having fun" with her innumerable boyfriends a higher priority than caring for her child. She quickly became oblivious to her responsibility to pick the child up from any sitter at a specified time, yet left the sitters with no way to reach her when she unilaterally extended the length of the child's stay with the sitter.
In light of the mother's conduct, it is truly remarkable, but fortunate, that the child has suffered little or no actual harm, and has avoided formal foster care placement. Fortunately, the child has found stability and parental care in the hands of responsible strangers who have shown more regard for his well-being than has his own mother.

OTHER ELEMENTS UNDER ART. 1015(3)
The trial court found the evidence clear and convincing that the mother "is now unfit to retain parental control, and there is no reasonable expectation of [her] reformation in the foreseeable future," the remaining elements of proof necessary under Art. 1015(3). This record strongly supports these factual findings.
An "unfit" parent is one who has abused or neglected the child (Art. 1003(10)(a), (b)), or
[w]hose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior. Art. 1003(10)(c).
The mother's established pattern of behavior with respect to her residences, her limited education, her sporadic work history and her succession of romantic relationships, the "serious" of which have been brief, and the longest of which has been blatantly abusive, clearly allows the finding that she has a "behavior or conduct disorder" which makes her unable or unwilling to provide an adequate permanent home for the child.
Although the mother's work habits appeared to improve somewhat after the parental termination action was filed, she had lost one of her recent jobs for physically assaulting her supervisor, demonstrating her inability or unwillingness to conform to even the most basic standards of interpersonal behavior expected of working adults. Her relationship with her latest "fiancé," either number three or four in one year, was openly stormy, even when the couple was at work, according to this record.
The trial court's finding that the mother is not reasonably expected to reform in the foreseeable future is also supported by the record. The mother testified that when she began leaving her child with Mrs. Snider in December 1992, she was unable to take care of him herself because she "was too young, and wasn't working, and [was] trying to finish high school." By the time of the hearing two years later, she still had not finished high school, and had worked for a total, at most, of about eight months at five different jobs, three of which she obtained only after the termination action was filed, even though she was free of day-to-day child care responsibilities for virtually the entire two-year period.
The mother's contact and interaction with the child and with Mrs. Snider during this period, albeit limited and intermittent, supports the trial court's implicit finding that the mother did not have the "intention to permanently avoid parental responsibility," one of the elements for termination on the grounds of abandonment under Art. 1015(9). Had abandonment been the only ground for termination asserted by Mrs. Snider, her chances of prevailing would have been slim. See and compare In the Interest of C.L.S., 94-531 (La.App. 3d Cir. 11/2/94), 649 So.2d 532 and State in Interest of P.R.B., 622 So.2d 716 (La.App. 5th Cir.1993). This action was not limited to abandonment, but included the grounds provided by Art. 1015(3).
*285 A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated, even when the parent is mentally ill or impaired. See, for example, State in Interest of Four Minor Children v. D.W., 585 So.2d 1222 (La.App.2d Cir.1991) and State in Interest of M.P., 538 So.2d 1112 (La.App. 5th Cir.1989). No less should be expected of a parent who, like Kelly, has not been shown to be mentally deficient. See and compare State in Interest of D.L., 457 So.2d 141, 146 (La.App.2d Cir. 1984):
Although the mother has opposed the child's adoption, and has expressed a desire to someday regain the child's custody, parental responsibilities are not fulfilled by merely expressing concern or having good intentions.
See also State in Interest of C.D., 558 So.2d 806 (La.App. 5th Cir.1990), in which a judgment of termination was affirmed against the mother who took no action to further her verbal expressions of motivation to reform and to regain custody of her children.
From those upon whom she imposed, Kelly has clearly received much guidance, encouragement and assistance designed to help her become able to provide a permanent home for her child. It is "crystal clear," as the trial court phrased it, from the evidence in this record, that those who initially helped the mother in a variety of forms so she could "get back on her feet" and "get her life together" soon realized, and justifiably so, that Kelly was doing little or nothing to help herself. Kelly's conduct has spoken more loudly and clearly than her words expressing an intent at trial to "be all I can be to my son" and to "give anything for him."

DECREE
Severance of the parent-child relationship is a harsh result that is warranted only when the evidence meets the very stringent legal standards for terminating parental rights. State in Interest of L.L.Z. v. M.Y.S., supra; State in Interest of C.P., 463 So.2d 899 (La. App.2d Cir.1985). We find the evidence in this record meets the stringent legal standards for terminating the mother's parental rights.
The eighth decree of the judgment appealed is amended to read:
The conduct of [K.V.N.] constitutes grossly negligent behavior which is below a reasonable standard of human decency, beyond a reasonable doubt.
At the cost of the mother-appellant, the judgment, as amended, is AFFIRMED.