674 So.2d 372 (1996)
Michael Todd HARVEY, Plaintiff-Appellee,
v.
OUACHITA PARISH SCHOOL BOARD, et al., Defendants-Appellants.
No. 28400-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
Opinion Dissenting from Denial of Rehearing June 20, 1996.
*373 Elmer G. Noah, II, Monroe, for Appellants.
Anthony J. Bruscato, Monroe, for Appellee.
Before MARVIN, STEWART and HIGHTOWER, JJ.
Opinion Dissenting from Denial of Rehearing by Judge Hightower, June 20, 1996.
MARVIN, Chief Judge.
In this action against the head coach of the West Monroe High School football team and the Ouachita Parish School Board arising out of an injury sustained during a football game in 1986 by Michael Harvey, a WMHS player, the defendants, Coach Ross Davis and the School Board, appeal a judgment finding them 80 percent at fault for Harvey's injury, a ruptured cervical disc, and awarding Harvey about $215,000 in damages, subject to reduction by 20 percent for his share of fault.
While conceding they owed some vague legal duty to protect high school football players from the risk of injury, defendants primarily question the trial court's findings that Coach Davis had and breached a duty to protect Harvey from the injury to his neck, which he sustained when tackled by players on the opposing team. Alternatively, defendants ask us to modify the trial court's allocation of fault and the assessment of Harvey's monetary damages.
Harvey argues in brief that he should not have been assessed with any fault, but he did not appeal or answer the appeal to preserve this issue for review. CCP Art. 2133; Starnes v. Caddo Parish School Bd., 598 So.2d 472 (La.App. 2d Cir.1992).
Amending the judgment solely to correct what we believe is a mathematical error in the calculation of Harvey's damages, we reduce the total award to $180,866 and affirm the judgment as amended.

FACTS
Harvey was injured on September 12, 1986, early in his senior year at WMHS, during a football game played in Shreveport against Booker T. Washington High School. A videotape of the game is in the record. By all accounts, the 17-year-old Harvey established himself as a gifted athlete and a "star player" for WMHS during his sophomore and junior years. Harvey played running back on offense and linebacker on defense.
In the third quarter of the game with BTWHS in Shreveport, Harvey, as a linebacker, intercepted a pass thrown by the *374 BTW quarterback, successfully eluding BTW tacklers and returning the interception from the 10 to the 50 yard line. As Harvey approached mid-field, a BTW player grabbed Harvey's face mask, forcing his head downward and toward his left shoulder and placing Harvey on the ground in a seated position. A 15-yard penalty was assessed against BTW for this infraction.
As Harvey was forced to the ground by the face mask infraction and in the "seated" position, another BTW player, pursuing and seeking to ground Harvey, "piled on" the upper part of Harvey's body, slamming his body against Harvey, whose head and neck were being contorted downward and to the left by the face mask infraction. These combined forces caused a compression injury to Harvey's spine. This injury left Harvey lying on the field, fully conscious, but unable to feel or to move anything below his neck for about 15 minutes.
Fortunately, Harvey's paralysis was temporary. After he regained feeling and movement, Harvey was removed from the field and taken by ambulance to the emergency room at a Shreveport hospital. At the request of Harvey's parents he was released from the ER on the night of the injury to return to West Monroe.
Harvey was then hospitalized at a West Monroe hospital for ten days, September 13-22, 1986. The initial diagnostic tests there being inconclusive, Harvey was returned to Shreveport for an MRI of the cervical spine, which was performed September 16, 1986.
The MRI showed that Harvey had a ruptured cervical disc at the C4-C5 interspace. Harvey's West Monroe neurosurgeon, Dr. Greer, referred Harvey to Dr. James Robertson, a Memphis neurosurgeon specializing in sports injuries. Dr. Robertson surgically removed the disc and fused the C4-C5 vertebrae with bone taken from Harvey's hip in November 1986.
After recuperating from the surgery, Harvey played baseball for WMHS during the spring of 1987, as he had done the year before. After graduating with his class, Harvey entered Louisiana Tech as a freshman, on a football scholarship, in the fall of 1987. His treating physicians cautiously or conditionally approved for Louisiana Tech Harvey's continuing his football career.
Notwithstanding his medical release to play football, Harvey was informed by his doctors that he faced a greater risk of reinjuring his neck, and of potentially permanent paralysis, than did players who had not undergone a cervical fusion. The doctors recommended that Harvey cease playing football if he experienced tingling or stinging in his arms or hands, leaving the final decision to Harvey.
Like other freshmen football players at Tech, Harvey was "red-shirted," being required to participate only in practices and scrimmages and not playing against opposing teams. In deference to his cervical fusion, Harvey wore a "neck roll" at all times in practice sessions and when scrimmaging. He sometimes experienced pain in his neck, and a stinging or burning sensation in his shoulders and thumbs, particularly after contact with another player. Fearing another neck injury, Harvey became less aggressive in his play, sometimes "holding back" and performing below his usual capabilities to avoid contact.
Harvey satisfactorily participated in the Tech football program in the fall of 1988, according to a Tech coach. He continued to experience pain and stinging, however, ceasing his college football career during the 1988 season because of his experience and his concern of more serious injury.
Before the 1986 high school injury, Harvey was being heavily recruited by several universities and colleges in Louisiana and other states to play college football.
Harvey brought his action for damages in Caddo Parish, joining as defendants the Caddo and Ouachita Parish School Boards, their respective high school football coaches, and the Louisiana High School Athletic Association. The LHSAA was dismissed on summary judgment. See Harvey v. Ouachita Parish School Bd., 545 So.2d 1241 (La.App. 2d Cir.1989). The Caddo School Board and coach were also dismissed before the trial.
The issues in this appeal hinge heavily on the factual circumstances leading up to Harvey's *375 injury, as found by the trial court. Sometimes referring to appellants singularly as the Board, we summarize the trial court's findings, express and implied:

TRIAL COURT FINDINGS
 Before his September 1986 injury, Harvey had suffered two prior, albeit minor, neck injuries as a football player for WMHS. His first minor injury occurred in a scrimmage in the spring of 1986, and his second in a pre-season jamboree game that August, preceding the regular season games. In each instance, Harvey told his father, a West Monroe doctor of chiropractic (D.C.), that he had "jammed" or strained his neck. Harvey's father observed and treated him for both injuries, noting that Harvey was free of symptoms within a week of each injury. Opinion evidence agreed that these injuries were minor, but had the effect of weakening to some degree Harvey's neck and increasing his susceptibility to more serious or severe neck injury.
 The day after the August 1986 "jamboree" injury, Dr. Harvey telephoned Coach Davis, asking that Harvey be excused from football practice for a few days, during which time Dr. Harvey would treat the jamboree injury, and informing Coach Davis that Harvey had to wear a neck roll in all practices and games for an indefinite period of time to protect Harvey's neck from further injury.
 Neck rolls were generally considered "optional" equipment for WMHS football players, unlike other protective equipment such as helmets, shoulder pads and knee pads, which each player was required to wear. The school furnished each player with the "standard" protective equipment, and carried spare items of such equipment when playing games away from West Monroe. The school generally did not furnish or carry replacements of "optional" protective equipment, but allowed players to use such equipment during games and practices if the players obtained the equipment for themselves.
 Shortly after Harvey's August 1986 neck injury, Harvey's parents purchased for him from a local sporting goods store, a horseshoe-shaped neck roll. A neck roll is designed to be tied in several places to shoulder pads. The horseshoe neck roll limits movement of the head in all directions, especially to the back or to either side.
 Harvey attached and wore the neck roll purchased by his parents in all practices, and in the first regular game of the season that was played the week before the BTW game.
 Harvey wore the neck roll during the BTW game until it was forcibly torn from his shoulder pads by a BTW player in the second quarter of the game. A referee picked up the damaged neck roll, briefly waving it over his head before throwing it off the playing field. The neck roll was damaged to such an extent that it could not be reattached to the shoulder pads. Harvey played the rest of the second quarter without a neck roll. At half time, one of the WMHS student trainers, answering Harvey's inquiry about an extra neck roll, said he had none. Harvey did not ask any of his coaches for a neck roll. Harvey resumed play in the third quarter without a neck roll.
 The coaching staff at the BTW game included Coach Davis and at least four assistant coaches: Aulds as offensive line coach, Smith and Moncrief as offensive backfield coaches, and Spears as defensive backfield coach. Aulds was also the team's equipment manager, but said he handled only "standard gear, not first aid supplies ... or injuries." Coach Davis relied on the assistant coaches, and on one or more uncompensated "student trainers" to assist him in fulfilling his duty as head coach, as he explained it, to monitor the players' medical needs and injuries.
 Coach Davis knew, or should have been advised by his subordinate coaches and trainers that Harvey's neck roll had been torn from him in the second quarter of the BTW game.
 Coach Davis knew that Harvey's father did not want his son to play without a neck roll because of the prior neck injuries. Based on that knowledge, and by Coach Davis's own admission, a neck roll was not optional equipment for Harvey during the BTW game, but was "required equipment... for his own benefit to prevent further possible injury to him and because of his parents' wishes."
*376 More probably than not, the type of neck roll Harvey wore at the start of the BTW game would have protected him from the severe neck injury he suffered in that game.

DUTY
In discussing Coach Davis's legal duty as head football coach, the trial court found that Davis and his assistant coaches had a duty to reasonably protect their players from injury during football games, which necessarily entail direct physical contact between players. This duty, in the trial court's view, included the duty of providing, or requiring players to wear, available protective equipment to minimize the risk of a player being injured when tackled, even by actions that violate game rules, such as the "face mask" and "late hit" infractions for which penalty flags are thrown.
The court found that Coach Davis and his staff breached their duty to Harvey in several respects: by generally having an attitude of indifference or ridicule toward players who expressed concerns for their own safety, by not having a clear designation of responsibility among the staff members for monitoring a particular player's susceptibility to injuries, and by their specific individual and collective conduct during the BTW game.
Harvey and two of his teammates testified that the coaching staff had sometimes ridiculed players who complained of injuries or requested additional protective equipment during games or practices, calling them "sissies" and telling them to "be tough." Coach Davis admitted that he sometimes "gigged" players who complained of minor injuries, such as bumps or bruises, but said he took all "legitimate" injuries seriously. The trial court described Davis's testimony on this issue as "troubling," and concluded that Davis and his staff "were not sufficiently concerned with their players' safety and complaints of problems."
According to Coach Davis, the entire coaching staff is responsible for monitoring students with injuries or with special equipment needs, yet no staff member noticed or inquired about the removal of Harvey's neck roll in the second quarter of the BTW game, even during half time when the coaches and the players convened in the visitors' locker room. In essence, the coaching staff's responsibility for monitoring the safety needs of the players in general, and of Harvey in particular, was assigned to everyone on the staff, but exercised by no one, on the night in question.
From the totality of the evidence, the trial court concluded that Coach Davis was negligent in allowing Harvey, the team's "star" running back who also regularly played linebacker on defense, to continue playing in the BTW game without a neck roll. The court found that Harvey was also negligent because he knew his father did not want him to play without a neck roll.
The court's allocation of 80 percent fault to Coach Davis and 20 percent to Harvey obviously takes into account not only the conduct of the respective parties during the BTW game, but also the apparent lax attitude of Coach Davis and his staff toward the safety of the players, and the absence of any clear delineation of specific responsibility within the organizational structure of the coaching staff for monitoring and preventing player injuries.
In reasons for judgment, the court determined that Harvey was entitled to about $20,000 in special damages, $125,000 for the pain, suffering and disability associated with his ruptured disc and cervical fusion, and $35,000 for his "anguish and suffering due to the loss of ... opportunity" to play college football, subject to the 20 percent reduction. These awards total $180,866. The judgment, however, makes an in globo award of $215,866, without itemizing each element of damages. Appellants complain of a $35,000 "error" in the in globo award.

DISCUSSION
The Board's first two assignments of error, dealing with the existence and breach of a duty and with the trial court's allocation of fault, are premised on factual assertions which are in some respects contrary to and inconsistent with the factual findings made by the trial court. The Board has simply extracted those portions of the testimony *377 which support its arguments, without attempting to demonstrate how and why the trial court was clearly wrong in accepting one of several permissible views of the evidence on the facts pertaining to duty, breach and fault allocation.
Our review of the record reveals ample support for the trial court's factual findings, which we have summarized. We particularly note that Coach Davis's credibility was significantly impeached by his having made inconsistent statements on several pertinent factual matters in his deposition, on the one hand, which was taken about two years after Harvey's injury, and at trial on the other, some seven years after the injury. Davis's attempt to "explain away" the inconsistencies, by saying his memory of the facts was refreshed when he heard other witnesses testify at the trial, apparently did little to help his cause.
The Board does not dispute that Coach Davis had a legal duty to reasonably supervise his players, nor does it dispute that the scope of such a broadly stated duty is necessarily fact-specific, to be determined on a case-by-case basis in light of the respective relationships and circumstances of the parties. See generally Herring v. Bossier Parish School Bd., 25,540 (La.App. 2d Cir. 2/23/94), 632 So.2d 920; Jarreau v. Orleans Parish School Bd., 600 So.2d 1389 (La.App. 4th Cir.1992), writ denied; and Wilkinson v. Hartford Acc. & Indem. Co., 400 So.2d 705 (La.App. 3d Cir.1981), reversed on other grounds, 411 So.2d 22 (La.1982).
The allocation of comparative fault is also fact-specific. See generally Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), and Coley v. State, through DOTD, 621 So.2d 41 (La.App. 2d Cir.1993).
The Board limits its focus on appeal to the evidence concerning the knowledge and the conduct of the respective litigants during the BTW game. As stated above, it is apparent from the record that the trial court resolved the duty and fault allocation issues by considering that evidence in the context of and in conjunction with other evidence concerning the coaching staff's general attitude toward player safety and the haphazard manner in which the staff monitored an individual player's need for protection from an injury to which that player was known to be susceptible.
On this record, and in light of the fact-specific nature of the duty and comparative fault inquiries in this case, we are unable to disturb the trial court's findings on either issue without overstepping the bounds of appellate review. Rosell v. ESCO, 549 So.2d 840 (La.1989).

QUANTUM
In assessing Harvey's general damages, the trial court made separate awards for Harvey's initial and residual pain and suffering resulting from the cervical disc rupture and surgical repair ($125,000), and for his mental anguish over the loss of an "almost certain" opportunity to play college football ($35,000). The court rejected, as speculative, Harvey's additional claim for damages for the loss of earning capacity he might have enjoyed as a professional football player.
Conceding that an award of $125,000 for the pain, suffering and disability associated with a ruptured cervical disc and surgical fusion may be justified in some cases, the Board argues that the award is excessive in this case, considering Harvey's relatively quick recovery from the surgery and his ability to resume playing football with medical approval after the surgery.
On this record, we must conclude that the Board's argument for modification of the damage award rests on a characterization of the facts which is neither full nor fair. The Board mistakenly describes Harvey's recovery from the surgery as "complete," failing to mention the physical complaints Harvey said he experienced after the surgery, both on and off the football field: stiffness and loss of flexibility in his neck, occasional headaches, and pain in his hands, arms and shoulders, which he described as burning, stinging or itching. These complaints were not alleviated by the rehabilitation exercises Harvey performed after the surgery, as prescribed by his doctors. The complaints did not disappear when Harvey ceased playing football in 1988, but continued through the time of *378 trial in 1992, according to Harvey, who was then 23 years old.
The Board's emphasis on the fact that Harvey's doctors approved his return to playing football after the surgery overlooks the undisputed evidence that the doctors also cautioned Harvey about his increased susceptibility to further and perhaps more severe neck injury in contact sports.
Harvey consciously experienced paralysis of his body from the neck down at the time of the 1986 football injury. Though that paralysis was relatively brief, it undoubtedly caused Harvey a great deal of anxiety while it lasted. The fear of reinjury, with perhaps a less fortunate outcome, obviously plagued Harvey when he resumed playing football, ultimately outweighing his great determination and desire to participate in a sport he enjoyed and at which he excelled.
Contending that the trial court made a separate $35,000 award for Harvey's inability to continue playing football, the Board argues that the difficulties Harvey experienced while playing football after the surgery may not be considered as part of the $125,000 damage award. As we appreciate it, the $35,000 award is for the mental anguish Harvey suffered over having lost the opportunity to play college football competitively, an opportunity that Harvey had envisioned and worked toward for many years before his injury. The physical pain and fear of reinjury that Harvey suffered after the surgery, before he ceased participating in the Tech football program, is an additional element of his damages and was, in our view, properly included in the $125,000 award for the physical and mental effects of the neck injury and the surgery.
Harvey's ability to continue engaging less aggressively, and for him less enjoyably, in sports such as baseball and golf after the surgery is more a measure of his innate athletic ability and drive, in our view, than an indication that he has "completely recovered" from the neck surgery, as the Board contends.
Other components of the $125,000 award include the pain and limitation of activities Harvey experienced for two months between the injury and the surgery, the battery of tests he underwent before his condition was definitively diagnosed, his daily use of a plastic cervical collar for two months before and one month after the surgery, and his loss of 30 pounds and generally weakened physical condition during that time. According to this record, the fact that Harvey was able to graduate with his high school class in spite of his having missed several weeks of school during his two hospitalizations and while he recuperated from the surgery was explained, at least in part, by his having had teachers come to his home after the surgery to assist him with his schoolwork.
On this record, we find no basis for disturbing the $125,000 award. Reck v. Stevens, 373 So.2d 498 (La.1979).

CALCULATION ERROR
The Board's final assignment alleges a mathematical error in the calculation or computation of the in globo damage award of $215,866 in the judgment. The Board contends the trial court itemized damages, the total of which is only $180,866 in its reasons for judgment: $20,866 for medicals, $125,000 for pain, suffering and disability resulting from the ruptured disc and surgery, and $35,000 for Harvey's anguish and suffering from the loss of opportunity to play college football. Noting that the $215,866 awarded in the judgment is exactly $35,000 more than the total of the awards itemized in the reasons for judgment, the Board contends the $35,000 award was inadvertently and erroneously duplicated in the judgment.
Arguing that the total award in the judgment is correct, Harvey claims the trial court intended to make two $35,000 awards, one for his "loss of opportunity" to play college football and the other for the "anguish and suffering" caused by that loss. Harvey contends this construction of the judgment is bolstered by the fact that the Board's attorney approved as to form, the judgment which the court signed, and did not question the amount of the award.
The calculation error asserted by the Board on appeal relates to the amount of the judgment and not to its form. The approval *379 by the Board's attorney of the judgment's form (in globo vs. itemized award) does not, of itself, preclude the Board from seeking to have the amount of damages modified on appeal for whatever reason, including errors in calculation or addition, or other discrepancies between the amounts in the trial court's reasons and the in globo award in the judgment. See and compare First Nat. Bank v. Inabnet, 571 So.2d 689 (La.App. 2d Cir.1990), and In the Interest of J.L.N., 27,568 (La.App. 2d Cir. 6/21/95) at pp. 18, 29, 658 So.2d 272, 280, 285.
We agree with the Board's assertion that a calculation error was made. After finding that Harvey had proven both special and general damages, the trial court stated:
... [A]n appropriate award of general damages for plaintiff is $125,000 for pain, suffering, and disability due solely to the cervical fusion and an additional $35,000 for his anguish and suffering due to the loss of not only a promising collegiate opportunity but almost a certain one. There is only one certain thing about the future (death). However, the burden of proof in civil cases is not certainty, but one of probabilities, i.e. by a preponderance of the evidence or more probable than not. The clear preponderance of the evidence in this case is that Mike Harvey was almost certainly headed toward a collegiate football program. The loss of that opportunity is a real loss that is compensable, and, as aforesaid, the court establishes the value of that loss at the sum of $35,000. Plaintiff's claim for damages due to loss of earning capacity in a professional [football] career is more remote and was insufficiently proved to be more probable than not. The claim of damages for loss of earning capacity [in] professional employment [is] therefore rejected. Medical special damages were proved to be in the amount of $20,866.11. (Our emphasis and brackets.)
Notwithstanding that the figure $35,000 appears in each of the above paragraphs, we agree with the Board's argument that the trial court intended to make only one award of $35,000. According to this record, Harvey did not make a claim for the monetary value of any loss of a college athletic scholarship. Harvey's loss in this respect, as the trial court said, is of the opportunity to fully participate in competitive football, a sport in which he excelled and enjoyed in high school. The loss of that opportunity caused him "anguish and suffering," to use the trial court's words, the measure of which loss or damage the trial court valued at $35,000. That amount was for Harvey's mental anguish over the loss of what was an almost certain opportunity to play college football.
As we appreciate the reasons for judgment, the court made a clear distinction between Harvey's claim for anguish and suffering arising out of the loss of the opportunity to play college football, on the one hand, and the claim for damages relating to a professional football career, on the other. Finding sufficient proof of the former claim, but not the latter, the court quantified the recoverable damages as $35,000. The second reference to $35,000 in the paragraph that followed is clearly, in our opinion, a reiteration of what the trial court stated in the preceding paragraph, and is not a second $35,000 award.
A calculation error in a judgment may be corrected either by the trial court or by the appellate court. CCP Arts. 1951, 2164. Here, the calculation error was raised for the first time on appeal. We shall correct the error by amending the judgment to delete the inadvertent duplication of the $35,000 award. See and compare Jones v. State, DOTD, 619 So.2d 626 (La.App. 3d Cir.1993), writ denied, and Woods v. Ratliff, 407 So.2d 1375 (La.App. 3d Cir.1981).

DECREE
We amend the judgment to reduce the total amount of the damage award from $215,866.11 to $180,866.11. In all other respects, and at the cost of the defendants, the judgment, as amended, is affirmed.
AFFIRMED AS AMENDED.
HIGHTOWER, J., dissents with written reasons.
*380 HIGHTOWER, Judge, dissenting.
Under the circumstances presented in this case, the majority misconceives and overextends the duty of a coach. Will athletic mentors and boards of education, under today's ruling, be responsible to protect from injury any football player previously suffering from even a minor mishap?
Further, assuming arguendo a duty of care as expansive as that imposed here, Harvey himself stood in the best position to be directly aware of his situation and to avoid any risk of playing without a neck roll. Having failed to act accordingly, he should bear the majority of the fault for his injury.
I respectfully dissent.
Before MARVIN, HIGHTOWER, BROWN, WILLIAMS and STEWART, JJ.

ON REHEARING
HIGHTOWER, J., would grant rehearing and assigns written reasons.
HIGHTOWER, Judge, dissenting.
Respectfully, I dissent from the refusal to grant a rehearing.
The earlier decision herein places an unreasonable burden on coaches, teachers, and school systems. It should be reexamined.
Consequently, I would grant the rehearing sought by the Ouachita Parish School Board, et al.