538 So.2d 1112 (1989)
STATE of Louisiana In the Interest of M.P. and B.P.
No. 88-CA-638.
Court of Appeal of Louisiana, Fifth Circuit.
February 15, 1989.
George E. Escher, New Orleans, for plaintiff/appellant.
Janice L. Kazmier, Bureau of Legal Services, New Orleans, for appellee, DHHR.
Before CHEHARDY, BOWES and DUFRESNE, JJ.
BOWES, Judge.
Appellant, Mrs. E, appeals a judgment of the Juvenile Court terminating her parental rights to her children, M.P. and B.P. We affirm.
M.P. and B.P. came into the custody of the Department of Health and Human Resources (hereinafter DHHR) on September 24, 1985. At that time, M.P. was approximately three years old, and B.P. one year old. They were left in the care of a minor when their mother, Ms. P (now Mrs. E), attempted to commit suicide on September 22, 1985. According to the DHHR worker, Sheryl George, the housing conditions and the condition of the children were "deplorable"; the testimony indicates that the children were victims not of physical abuse but rather of neglect. The children were taken into custody and adjudicated to be children in need of care on November 26, 1985. At first, they were placed in St. *1113 Vincent's Infant Home, and later with the foster parents, Mr. and Mrs. G, with whom they continued to reside (through the date of the termination proceedings).
Ms. P was taken to West Jefferson Hospital following her suicide attempt where she remained for approximately one and one-half weeks. Afterwards, while the children were in the State's custody, Ms. Virginia Arias was Ms. P's family service worker. Ms. Arias testified that a contract between Ms. P and the Department was drawn up and renewed every six months. Basically, Ms. P was to obtain stable housing, stable employment, attend therapy at West Jefferson Mental Health Clinic, and to visit the children regularly. Later, she also agreed to attend parenting classes at Family Services of Greater New Orleans. In June of 1987, the Department informed Ms. P that it planned to proceed with the process of termination of her parental rights. The petition for termination was filed in December, 1987. After trial, the court granted judgment in favor of the State, terminating all parental rights of Ms. P (then Mrs. E) relative to M.P. and B.P. Mrs. E. appeals.
In his reasons for judgment, the trial court stated that the State had proven by clear and convincing evidence all of the elements of LSA-R.S. 13:1601(B) and, additionally, pursuant to LSA-R.S. 13:1602(D) that the State proved that the best interest of the children dictated termination of parental rights:
"... because the mother continues to be emotionally ill and unable to provide an adequate permanent home for her children, she has shown no significant substantial indication of reformation since her children were removed from her custody and found in need of care due to physical neglect over two years ago, and she is unlikely to reform in the forseeable [sic] future to the point where she would be able to care for the childrens' needs. Both children, who are of pre-school age, have bonded with their foster parents with whom they have lived for over two years, and the foster parents express a sincere desire to adopt the children and are extremely capable of fulfilling the needs of the children. After an in-depth interview with both children in chambers, the Court finds the children are highly amenable to adoption and that their best interests dictate termination of parental rights to free them for adoption and stabilize their lives so they may begin their first years of school in a permanent home which adequately provides the emotional, physical and financial support they require."
LSA-R.S. 13:1601(B) provides:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsections A, B, C, D, E, or F, of this Section. The district attorney may appoint any attorney representing the Department of Health and Human Resources as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
. . . . .
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
LSA-R.S. 13:1602(D) provides:
The district attorney or the appointed attorney for the child must prove that the child has been abused or neglected or the other elements enumerated in R.S. 13:1601 exist, and that the best interest of the child dictates termination of parental rights.
Pertinent to the present case also is LSA-R.S. 13:1600(6)(c) in which a definition of "unfit" refers to a parent:

*1114 (c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
At trial, Mrs. E testified that she had married Mr. P in 1980, living with him for approximately one year. She began living with another man, who became the father of M.P. Afterward, she left him and began living with another man, when B.P. was conceived; however, the father of B.P. was still another man (not the one with whom she was then living). After these relationships failed, she lived with several other people, including other men, until she moved in with Mr. E in May, 1986. Mr. and Mr. E were married in July of 1987.
For his part, Mr. E's marriage to Mrs. E was his fifth. He had three natural children, and six other stepchildren. He was steadily employed as a truck driver, making three to four hundred dollars per week. At least one of his other stepchildren was in the custody of DHHR for some (indeterminate) period of time. Mr. and Mrs. E met while Mr. E was still married to, and living with, his fourth wife (Mrs. E, then Ms. P, moved in with the couple). By the time of the hearing, Mr. and Mrs. E had been together for two years. They had lived at their present address for one year.
Mrs. E began employment at a McDonald's restaurant two or three weeks prior to the trial. Prior to her job at McDonald's, her employment history was sporadic: she was employed at a Pizza Hut from 1980-1982; after the birth of M.P., she began to receive welfare and food stamp benefits until September of 1985, when the children were taken into custody. From then until February, 1986, she was unemployed and had no income, living with "friends." In February, 1986, she began a one month stint at an Omelet House restaurant. Next, she worked at a cleaning store for several weeks, then at a "Po' Folks" restaurant for approximately ten months, through September of 1987. She was unemployed between September, 1987, and February, 1988, when she began her job at McDonald's. Between jobs, she moved several times, until she moved with Mr. E to their present address.
It was also established that throughout the period that the children were in custody, Mrs. E did not keep her regularly scheduled therapy visits. She kept approximately 50% of her scheduled visits at Family Services over the two-year period. Between January, 1986, and February, 1987, she missed an unspecified number of appointments at the Mental Health Center, and, in March, 1987, completely stopped all visits. Her case was closed at West Jefferson for failure to make contact. Mrs. E kept most of her weekly visits with the children (approximately 80%).
The mental/psychological evaluations on Mrs. E are extremely significant. In December, 1985, Dr. Nathan Lubin examined Mrs. E, after Mrs. E asked Ms. Arias for help, telling her worker "that she felt that she might hurt herself...." Dr. Lubin found her to be "severely emotionally disturbed," capable at that time of suicidal behavior.
"Due to the severity of her disturbance, she would have considerable difficulty in handling her relationship with her children... she would be in need of relatively long term and intensive psychotherapy."
In April, 1987, Mrs. E was evaluated by Dr. Rennie Culver, a psychiatrist. Dr. Culver diagnosed her as being mildly retarded or marginal (her tested I.Q. was 70) with a probable psychotic character or borderline personality. "I do not see her as a stable woman, and do not believe that she is likely to function adequately as a mother. I therefore feel that it is probably in the best interest of the children to terminate her parental rights."
Dr. John Monguillot, a clinical psychologist, also evaluated Mrs. E, in November of 1987, and testified at trial. Dr. Monguillot had benefit of the previous evaluations, and also administered his own psychological *1115 tests, as well as having discussions and observations of Mrs. E. Dr. Monguillot found that Mrs. E had been hospitalized during her teenage years in a psychiatric facility for some (unspecified) period of time. He did not find that Mrs. E was capable of providing adequate care for her children. "I think that is extremely unlikely...." Dr. Monguillot had treated M.P. previously and diagnosed her as being clinically hyperactive, and felt that Mrs. E would have particular difficulty with M.P. In his written report, Dr. Monguillot stated:
"Her dependence upon others, her failure to maintain employment, her non-compliant use of the psychotropic medication prescribed for her, and her simplistic, almost childlike approach to the world, all indicate that her basic problems remain and will continue to remain. I am unable to recommend that Ms. [E] be reunited with her children as the dynamic factors which led to their removal are still very much in place and subject to exacerbation. My familiarity with her daughter [M.P.] and her problems also leads me to conclude that Ms. [E] is unable to respond appropriately to [M.P.'s] peculiar needs as a hyperactive child."
When asked whether his recommendation would change were Mrs. E to maintain stable employment, and sought the necessary mental health treatment, Dr. Monguillot replied:
"If she was still, you know, continuing those efforts and it appeared that she were improving. I would hold more hope out for her ability to be re-united [sic] with her children. What I was looking at, was, you know, someone who's been involved with the Office of Human Development and this, you know, case management treatment process for, very nearly, two years. And, I still had sufficient concerns about where she was at that particular time. And, one of the factors that I .. that I consider in these evaluations is that .. you know .. while adults can take .. you know .. a number of years to, you know, to improve their level of functioning. You know, children are not granted the same amount of time to go through developmental stages and a [sic] that a number of years in a child's life can be disrupted significantly, while parents are getting themselves together. And if it doesn't look like there's a reasonable prospect of that, then I think that it's in the best interest of the children for life to go on."
The only positive testimony even slightly in favor of Mrs. E, of any professional, was that of Marjorie Durand, who had been Mrs. E's counselor/therapist at Family Services. Ms. Durand testified that because of the length of time over which Mrs. E spread her appointments, keeping only 11 out of 20 scheduled visits, it was difficult to judge any improvements in Mrs. E, but Ms. Durand did not feel that Mrs. E retained the suggestive practices they had discussed. While she did not believe Mrs. E capable of caring for her children "at this particular time", she felt that it was a "possibility" Mrs. E could learn to manage better and cope with the children.
All the evidence taken together compels this court to agree with the trial court that it is in the best interest of the children that the parental rights of Mrs. E be terminated. The medical testimony leaves no question about the fact that Mrs. E is "unfit" under the definition quoted hereinabove, since all authorities agreed that Mrs. E's emotional illness and behavior pattern makes her unable to provide an adequate permanent home for her children at the present time or in the foreseeable future. In fact, hope that Mrs. E might change to the point where she would become a fit mother and could provide an adequate permanent home appear to be practically nil. Similarly, under R.S. 13:1601(B)(2), the evidence preponderates overwhelmingly toward the conclusion that Mrs. E has not shown significant substantial indication of reformation, nor has she presented herself as likely to reform. The patterns described by the DHHR workers and Dr. Monguillot depict sporadic attempts to improve her personal situation through various therapies. She held her present job for less than one month prior to the hearing. Once *1116 served with pleadings for termination, she returned to her mental health appointments. However, the professional opinion appears clear that Mrs. E needs long-term intensive psychotherapy, and Mrs. E's record, even after her children were removed from her custody, of engaging in this much-needed therapy is fraught with failure and too inconsistent to convince this court that she is likely to reform.
The term "reformation" in this context may seem unfortunate when considered in the context of emotional or mental illness. We interpret it to mean, in cases such as this, that the emotionally-ill parent must evidence strong intent, combined with a strong effort to obtain the assistance necessary to effect a positive change. Mrs. E showed neither intent nor effort to seek therapy. She went when chauffeured by her worker or later her husband. It appears that she did not go when it was inconvenient. It is not clear from the record why she abruptly ceased all therapy in March, 1987. After her children had been removed from her custody because of her neglect, combined with her emotional illness, she was given a two-year opportunity to improve, but she did not take advantage of this opportunity sufficiently to convince either the trial court or this court that she is capable of participating in her own improvement. Ergo, we find that she is most unlikely to reform.
We are impressed with the fact that the trial judge, while finding at the end of the first hearing that Mrs. E was not capable of caring for her children under the applicable statutes, was uncertain as to whether to terminate parental rights (as opposed to ordering a long-term foster care situation) until after he interviewed the children in chambers. Obviously, he was concerned about the children's relationship with their natural mother. He found that it was in the best interest of these children that there be a termination of Mrs. E's rights with probable adoption by the foster parents. He found that such would stabilize them in a home with emotional, physical, and financial support.
We agree. This type of decision is heart-rending to all involved. But, when all is said and done, it is the best interest of the children which must dictate the difficult judicial decisions made in juvenile court. The overwhelming evidence against Mrs. E as a fit mother, as well as the judge's discussions with the children in chambers, apparently convinced him that there was no alternative to termination of Mrs. E's parental rights and we find nothing in the record to indicate error or abuse of discretion.
Because the termination of parental rights is such a severe and permanent action, the law requires the State to meet an onerous burden of proof before termination will be ordered. See State in Interest of Quilter, 445 So.2d 101 (La.App. 2 Cir.1984). In termination proceedings brought under R.S. 13:1601(B), the State must prove each of the elements by clear and convincing evidence. R.S. 13:1603(A). In the present case, we hold that the State carried its burden of proof without a doubt.
The poignant assessment of Dr. Monguillot, that adults can take years to improve their level of functioning but that children are not granted the same amount of time and their lives are significantly disrupted while the parents are "getting themselves together," is very true in this case; and, although the decision we reach will undoubtedly be painful to Mrs. E, the facts and circumstances of this case and the well-being and best interest of these children dictate this result, as their lives, indeed, must go on.
The judgment appealed from is affirmed.
AFFIRMED.