558 So.2d 806 (1990)
STATE of Louisiana in the Interest of C.D. & M.D.
No. 89-CA-688.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1990.
*807 Janice L. Kazmier, Dept. of Soc. Services, Bureau of Gen. Counsel, New Orleans, for plaintiff/appellee.
Theresa A. Beckler, Metairie, for defendant/appellant.
Jamie Vaverica, Dist. Atty's. Office, Gretna.
Samuel Stephens, Juvenile Court, Gretna.
Before KLIEBERT, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
In this appeal the unmarried mother of two children opposes the termination of her parental rights by judgment of the Juvenile Court of Jefferson Parish.
The two children are C.D., born November 2, 1982, and M.D., born January 25, 1986. C.D. was adjudged a child in need of care on May 21, 1985 and M.D. on July 2, 1986. Earlier, the three older children of the mother, F.D., had been removed from her by judgment terminating parental rights.[1] C.D. was placed at first with the mother's aunt, while M.D. was placed in a foster home. C.D. was moved to the home of the mother's brother and sister-in-law, and finally in December, 1988 to the foster home of Mrs. Hankins. M.D. was placed there in February, 1989. Mrs. Hankins would like to keep and adopt the girls, now ages seven and three. On April 24, 1989, the state petitioned for termination of parental rights, pursuant to LSA-R.S. 13:1600 et seq. After hearings on July 31 and August 28, 1989, the court rendered and signed a judgment on September 7, 1989, terminating all parental rights and obligations of F.D. to the two children and ordering that the children remain in the custody of the Department of Social Services pending permanent placement. This suspensive appeal followed.
The issues raised are whether the state carried its burden of proof under LSA-R.S. 13:1603, which requires clear and convincing evidence, and whether the judgment of termination under LSA-R.S. 13:1601(B) was manifestly erroneous.
The applicable statutes appear in LSA-R.S. 13:1600 et seq. LSA-R.S. 13:1601 provides:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsections A, B, C, D, E, or F, of this Section. The district attorney may appoint any attorney representing the Department of Social Services as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
. . . . .
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
R.S. 13:1600(6) defines "unfit" as follows: (6) "Unfit" refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health, moral, or emotional well-being is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall *808 not constitute grounds for termination of parental rights; or
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
R.S. 13:1603(A) states that allegations made under section 1601(B) must be proven by clear and convincing evidence. Finally, section 1602(D) provides that:
The district attorney or the appointed attorney for the child must prove that the child has been abused or neglected or the other elements enumerated in R.S. 13:1601 exist, and that the best interest of the child dictates termination of parental rights.
The termination of parental rights is a severe deprivation. Under due process, certain safeguards must be instituted before the state may deprive a person of his parental rights. Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, the conflicting interests of the parents must be balanced against the child's interests, and the jurisprudence has held that the best interest of the child is paramount. In Interest of Boudreaux, 427 So.2d 891 (La. App. 1st Cir.1983), writ denied 432 So.2d 267 (La.1983). See also State In Interest of C.V. v. T.V., 499 So.2d 159, writ denied 500 So.2d 411 (La.1986); State In Interest of S.A.D., 481 So.2d 191 (La.App. 1st Cir. 1985); State in Interest of M.P., 538 So.2d 1112 (La.App. 5th Cir.1989).
Unfitness Of Mother
Counsel for the mother argues that she is not unfit under the definition provided by R.S. 13:1600(6). She quotes the definition as it read prior to the amendment of Acts 1986, No. 234, § 1; however, in her brief she discusses only the definition of "Child in need of care" as it appears in R.S. 13:1600(7)(a) and (b).[2] She argues that since there is no allegation or evidence of intentional acts of abuse on the part of the mother, and since she is financially unable to provide, she is not unfit.
The thrust of the mother's argument is that the state was responsible for rehabilitating her from the time C.D. was removed from her custody in 1985 to the present and has failed to do so. She also alleges that the state made no attempt toward reuniting her with her two daughters.
Counsel for DHHR points out that the mother cannot now attack the previous judgments in which the court declared the children to be in need of care. She avers that the mother is legally unfit by virtue of her substance abuse, incarcerations, meager education and sparse work history, along with her lack of effort or motivation toward reuniting her family. DHHR explains further that the statutory definition of unfitness includes not only intentional harmful acts but passive conduct that may harm a child. State In Interest of C.V. v. T.V., supra. DHHR avers that its workers attempted to assist the mother but she failed to follow through on recommendations.
The mother, F.D., testified as to incarcerations beginning in 1980 in Texas, West Virginia, and most recently in Jefferson Parish Correction Center and St. Gabriel, from October, 1986 until her release in May, 1989. Her only long term home was with the father of the children; while living there she was denied Aid to Dependent Children because she was not married to *809 him. The only job she reported having held was as a maid for three months in a motel, before the children were taken into custody. After her release from jail in May, 1989 she entered Virginia's College for Cosmetology, attended a week, then left after finding the available transportation impractical. She began a course at the Institute for Electronics as a nursing assistant on July 25, 1989. That school apparently disbanded and she began a correspondence course in another school on August 15, 1989, shortly before the second hearing date. Her housing has been unsettled since her release. She has lived in six different places, with friends or relatives and in a shelter for brief periods. At the time of the hearings she was residing with her brother and indicated she could stay there indefinitely. It is doubtful that this home would be suitable for her if the children were returned, as C.D. was removed from there at the brother and sister-in-law's request, according to a social worker's testimony.
As to F.D.'s allegation that DHHR had not lived up to its responsibilities toward her, the record reveals that six different social workers worked on the case between May, 1985 and the second hearing. Ms. Leavitt testified to working with F.D. in regard to C.D. from May, 1985 until October, 1986. Although Ms. Leavitt's contacts with F.D. and the children were irregular, she did make appropriate recommendations to F.D. regarding employment and housing; however, F.D. generally failed to follow through. Ms. Leavitt related an incident that occurred in October, 1985, when F.D. was hospitalized after having been beaten up. Ms. Leavitt arranged for F.D. to enter the battered women's shelter following her release and eventually to enroll in their independent living program. The battered women's program discharged F.D. because "she and another resident had gone away from the shelter and that somehow [F.D.] had got the other resident to get in some kind of a trick to get Mr. Melvin Brown arrested." The police arrested both women, a situation which the battered women's program would not tolerate.
Ms. Steib was the case manager and F.D.'s social worker from August, 1988 through the trial. F.D. was incarcerated at St. Gabriel when Ms. Steib took over the case. Most of her contacts with F.D. in person took place at court hearings and when she accompanied the children on visits to their mother at the prison; however, she testified to being in regular contact with F.D. by letter and through the counselor at St. Gabriel. F.D. was told at a court hearing in August, 1988 that the DHHR plan was to initiate termination proceedings. The judge and Ms. Steib told her then and at a later hearing that regardless of what disposition was made of the children she would need housing and employment in order to avoid further incarceration. F.D. stated repeatedly that she wanted to get her children back. In April, 1989 Ms. Steib asked her to contact her immediately upon her release in May to set up appointments so that DHHR could initiate services for her. She followed this request with a letter on May 12, reminding her to call. F.D. failed to appear at a meeting regarding the children and later called Ms. Steib to say that she missed the meeting because she was working. When Ms. Steib called the factory to check she was told by the payroll office that F.D. had not worked there. While it is unfortunate that F.D. did not have the continuing support of one social worker, the record indicates that the individual workers did attempt to help her stabilize her life. She apparently was unable to utilize their recommendations and referrals.
Dr. Chalasani, qualified by the court as an expert in psychiatry, testified that he had evaluated F.D. at St. Gabriel on September 21, 1988. He found her to be free from any significant psychiatric disorder, particularly psychosis or depression. She appeared to be functioning in the average range of intelligence and to be motivated toward custody of the children. She acknowledged having problems she would have to overcome first, specifically substance abuse and being unable to work regularly. He recommended that upon release from prison she be placed in a half-way *810 house with an alcohol and drug abuse recovery program, that she be referred for training and/or employment, that she undergo random urine drug screening, and that she receive counseling as to her own emotional needs and improving parenting skills. He further recommended that she remain under supervision for at least five years and that the children be reintroduced one at a time, with the mother gradually taking over more responsibility. He felt that without therapy she would be unable to succeed in the twenty-four hour job of caring for her children. He felt that even if all his recommendations were carried out the return of the children could take longer than three years, as she has not to date been prepared for the role of mother.
Termination Of Parental Rights
We are convinced that, in the words of R.S. 13:1600(6)(c), F.D. is "unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future," and that the state proved its case by clear and convincing evidence.
She has made no progress toward employment since the girls were removed. The psychiatrist's evaluation suggests that she may have the potential and motivation for rehabilitation but indicates that she would require a number of years with considerable support to reach the point where she would function as a responsible, caring parent.
In the meantime her seven year old daughter, C.D., has undergone therapy for the past two and one-half years. Dr. Hardin, a psychologist, testified that she began treating C.D. when she was showing serious behavior problems in kindergarten. She felt that she had very good intellectual potential and was functioning at a cognitive level considerably above her chronological age, despite her emotional problems. She stated that the child needs a home which can provide "considerable structure, considerable predictability, a stimulating and loving environment." She felt the current placement with Mrs. Hankins was providing that environment and that moving her would be extremely disruptive. Although Dr. Hardin had no contact with the younger girl, M.D., we assume the need for a stable environment applies to her as well as C.D. Dr. Hardin explained:
They [the moves] also get to be more and more difficult the older a child is because the child is going to become more and more mistrustful. So that [he] needs to be settled, probably at least, by the time a child is eight if they're going to have a chance. Because if you try to do that when a child's an adolescent then they're going to be sitting in here I'm afraid for other reasons.
We agree with and adopt the reasoning of another panel of this court in State v. M.P., supra: that adults can take years to improve their functioning but that children are not granted the same amount of time, and their lives are significantly disrupted while their parents are attempting to deal with their own problems. The court held that termination of the parent's rights was in the best interest of the child. We find the same situation exists in the case before us, as these are critical years in the development of the two children. The record supports the decision of the trial court.
Accordingly, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] State in Interest of Dillard, 450 So.2d 977 (La. App. 5th Cir.1984).
[2] (7) "Child in need of care" means a child:

(a) Whose parent inflicts or allows the infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental, or emotional health of the child.
(b) Whose physical, mental, or emotional condition is threatened or impaired as a result of the refusal or neglect of his parent to supply the child with necessary food, clothing, shelter, or medical care, or as a result of the parent's neglect or imposition of cruel punishment.