CGOTHARD, Judge.
This is an appeal by a mother from a judgment of the Juvenile Court for the Parish of Jefferson, State of Louisiana, ■which irrevocably terminated her parental rights to her son, and which granted the intrafamily adoption of her child by her sister and brother-in-law. For reasons that follow, we affirm.
Mr. and Mrs. J.M., the sister and brother-in-law of L.M.B., filed a petition on May 2, 2000 in the Juvenile Court for the intra-family adoption of B.J.B., L.M.B’s son. The record shows that B.J.B was born on July 19, 1995, to L.M.B. and D.B. The parents were subsequently married. The biological father, D.B., executed a voluntary act of surrender for adoption, and is not a party to this action. The child has been in the physical care, custody and control of Mr. and Mrs. J.M. since January, 1998, and they 13were granted temporary legal custody of the child by judgment rendered in the Twenty-Fourth Judicial District Court on July 27, 1998. The District Court record in the custody proceeding was entered into the Juvenile proceeding as evidence. In the District Court record it is apparent that both biological parents were served with notice and filed an answer opposing the action for permanent custody. L.M.B. did not attend the hearing and on August 17, 1998, the court rendered a judgment of permanent custody to Mr. and Mrs. J.M. Subsequently, they filed this action in Juvenile Court seeking the irrevocable termination of parental rights and adoption.
After a hearing on the merits on November 13, 2000, the Juvenile Court took the matter under advisement. On November 27, 2000 the court rendered the judgment appealed herein, with extensive written reasons.
The testimony given by the biological mother, L.M.B., shows that she began abusing alcohol in 1997 and became addicted to drugs in January, 1998. She stated that she began “binge” drinking about once a month in 1997, and had spent one week in a treatment center. At that time she and her son were living alone. In January, 1998 she went to the Royal Sonesta Hotel in the French Quarter with her husband, D.B., to attempt to resolve relationship problems the two were having. She left her son in the care of a babysitter. During that time she began abusing drugs. She stated that her mother and father brought her son to their home after he spent a few days with the babysitter. Shortly thereafter, Mr. and Mrs. J.M. took the child in and cared for him. L.M.B. has not had physical custody of her son since that time.
| ¿L.M.B. admitted that she was using drugs on a daily basis and was unable to care for her son during 1998 and 1999. She became aware of the custody proceedings in July of 1998, but was unable to attend the hearing because D.B. kept her “drugged” and there were warrants out for her arrest.
L.M.B. chronicled her life during 1998. She described extensive drug and alcohol abuse, arrests and unsuccessful rehabilitation attempts at various treatment centers, including a 45 day stay as a result of a judicial commitment. She was arrested on at least two occasions for drug violations, and driving while intoxicated.
She stated that she has not seen her child since January, 1998 when he was two-years-old. She could not recall if she *188 called her child during the Christmas season in 1998. However, she did testify that she sent a card and a toy to her son. She admitted that she has been unable to care for her child, and is not seeking custody of her child. Her understanding is that her mother and sister would care for her child until she “got well.” However, she stated that she “had no idea” when that would happen.
L.M.B. stated that she stayed in contact with her mother and requested a visit with her son. However, that request was denied. She knew that at that time her sister had legal custody; however, she did not call her sister to request a visit with her son. L.M.B. stated that her sister moved and she did not know the exact address. She admitted that she had done nothing for her son in the last three years.
L.M.B.’s mother, G.M., testified that her daughter was abusing alcohol in 1997 and described one incident when L.M.B came to her home | Blate at night to pick up her son. L.M.B. was intoxicated and became so enraged when her mother and father would not let her leave with her son, she put her hand through a glass window. G.M. explained that she and her husband tried in vain to get their daughter to seek help for the substance abuse. G.M. also testified that in January, 1998, she attempted to get in touch with L.M.B. for several days to no avail. G.M. called the baby sitter in whose care L.M.B. often left her son. G.M. discovered that L.M.B. had left the child with no extra clothes or food and was supposed to return in a few hours. When she did not return a few days later, G.M. and Mrs. J.M. took the child home. L.M.B. called her the next day, but refused to divulge her whereabouts. G.M. urged her daughter to get help and to keep in touch. L.M.B. called about one week later. She was screaming and incoherent. She called about ten days later in the same condition. The periods between phone calls lengthened and when L.M.B. did call she was obviously on drugs. In every conversation with her daughter, G.M. urged her daughter to get help, but L.M.B. response was anger and refusal.
In March, 1998, G.M. underwent back surgery and was no longer able to care for her grandson. It was at that time that Mr. and Mrs. J.M. took over total custody of the child.
G.M. testified that she was contacted by L.M.B.’s criminal attorney who suggested that a judicial commitment would help. G.M. was delighted with the proposal and hopeful that treatment would help her daughter regain control of her life. With the help of counsel, G.M. and her husband were able to have L.M.B. admitted to De-Paul Treatment Center. During L.M.B.’s stay in the treatment center, G.M. and her husband took B.J.B. to |fivisit his mother. At that time they urged their daughter to stay until she was certain she could stay clean. Unfortunately, ■ shortly afterward L.M.B. was transferred to a voluntary treatment center. She walked out and immediately began using drugs. A second commitment also resulted in failure.
G.M. testified that she and her husband have repeatedly told L.M.B. that they would not abandon her as long as she was trying to get well, and constantly urged her to seek help. G.M. testified that she considered her daughter to be unfit to care for B.J.B. G.M. further testified that there was no real bond between L.M.B. and her child since he was only two-years-old when he was left with the babysitter in January, 1998. G.M. told the court that she thought the adoption of the child by her other daughter and son-in-law, Mr. and Mrs. J.M., was in the best interest of the child.
L.M.B.’s father, J.M, also testified. He explained that during 1997, L.M.B. left her child with babysitters often to go out to *189 get drunk. He described an incident which happened on Halloween night in 1997. J.M. stated that he and his wife were going to take their grandson out for trick or treat. They asked L.M.B. to accompany them, but she refused. She returned much later that night in a “very intoxicated” condition. When J.M. tried to convince her not to go out again, L.M.B. became physically abusive and “pushed” both J.M. and his wife. L.M.B. then put her fist through a glass window and had to be taken to the emergency room for treatment.
J.M. further testified that his grandson never asks for his mother, and has bonded with Mr. and Mrs. J.M. He stated that the child is flourishing l7in their care, and that he believed the adoption was in the child’s best interest.
The court also heard testimony from S.P., who often babysat for the child in 1997. She stated that L.M.B. often returned late to pick up her child in a condition described by S.P. as “drunk, stumbling, screaming.” S.P. testified that L.M.B. was in no condition to care for her child. S.P. related one incident in which the child was in her care. He was running a fever and S.P. called L.M.B.’s cell phone. L.M.B. became angered by the call and screamed at S.P. She told S.P. to put the child in cold water if his fever rose above 102.5 degrees, and not to call back. Although L.M.B. was supposed to return for her child that night, she did not. S.P. kept him overnight and brought him to another babysitter the next morning.
Mrs. J.M., L.M.B.’s sister, testified at the hearing. Her testimony regarding L.M.B.’s lifestyle and the circumstances under which the child came to live with her and her husband is consistent with the testimony of G.M. and J.M. Mrs. J.M. stated that she has not seen, or had a conversation with L.M.B. since May, 1998. L.M.B. has had no contact with B.J.B. since that time. She did state that L.M.B. sent a toy for her child during the Christmas season in 1998.
Mrs. J.M. also testified that the child has never asked for his mother. He believes that Mr. and Mrs. J.M. are his parents. Mrs. J.M. stated that L.M.B. has never asked to see her son.
Mr. J.M. and a family friend also testified regarding the substance abuse and inability of L.M.B. to care for her child. Mr. J.M.’s testimony 1 Rcorroborates that of his wife in that the child is welcome in his home -and they have bonded as a family.
E.P. testified on L.M.B.’s behalf. She stated that L.M.B. asked her to babysit for a few days in January, 1998 and brought the child over to her with adequate clothes and provisions. E.P. testified that L.M.B. called her about twice a day. She denied seeing L.M.B. in a drunken state and considered her a good mother to her child.
T.S., a cousin of L.M.B. and Mrs. J.M., testified that she sees L.M.B. every weekend. T.S. stated that L.M.B. is no longer using drugs and that she trusts L.M.B. with her young granddaughter.
J.S., LM.B.’s aunt and godmother, testified that L.M.B. was a good mother to her son and did not neglect him. She also stated that she has seen Mr. and Mrs. J.M. with the child, and they are good parents to him.
S.R., a friend of L.M.B., testified that she has known L.M.B. since 1987. She was aware of the fact that L.M.B. was abusing drugs for a period of time in 1998. Her understanding with regard to the care of the child during that period was that Mr. and Mrs. J.M. were to care for the child for a few weeks until L.M.B. could “see her way clear.” S.R. testified that L.M.B. was a wonderful mother who always put her son’s needs first. S.R. stated *190 that she did not see L.M.B. in a drunken state and was only aware of her abuse of drugs after her arrest in January, 1998.
L.M.B. was re-called to the stand at the end of the hearing. She was allowed to explain her behavior and express her feelings regarding the adoption. She admitted that she had abused drugs and alcohol, and had made some serious mistakes. She stated that much of the cause of her 19substance abuse was manipulation by her husband, D.B., with whom she no longer has a relationship. She expressed gratitude to her sister and brother-in-law for caring for her child, but stated that she was now ready to resume her life and to properly care for her child.
After hearing all of the testimony, the trial court took the matter under advisement and in due course rendered judgment terminating L.M.B.’s parental rights and granting the adoption of B.J.B. by Mr. and Mrs. J.M. It is from that ruling that L.M.B. appeals.
In three assignments of error, appellant argues that the Juvenile Court erred in terminating her parental rights and granting the adoption.
Under LSA-Ch.C. Article 1243, as amended, a sibling of the biological parent is authorized to petition the court for an intrafamily adoption. Thus, the petitioners who are the sister and brother-in-law of the mother are proper parties to petition the court. Generally, a parent’s consent is required for an intrafamily adoption. However, LSA-Ch.C. Article 1245 B(2) provides that the consent of a parent is not required:
B. When a petitioner authorized by Article 1243 has been granted custody of the child by a court of competent jurisdiction and any one of the following conditions exists:
(2) The parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
Further, LSA-Ch.C. Article 1255A provides that:
The court, after hearing and after taking into consideration information from all sources concerning the intrafamily adoption, may enter a final decree of adoption, or itlinmay deny the adoption. The basic consideration shall be the best interests of the child.[1]
In intrafamily adoptions the trial court must first decide whether a parent’s rights should be terminated. It is only after that decision is made that the court may consider whether the adoption is in the best interest of the child. In intrafam-ily adoptions the petitioner must prove the grounds for termination by clear and convincing evidence. In Re Dantzler, 99-0625 (La.App. 1 Cir. 6/25/99), 739 So.2d 907, 909-910, writ denied, 99-2228 (La.8/2/99), 747 So.2d 38.
In the .instant case, the ground on which the action lies is the failure of the mother to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months. LSA-Ch.C. Article 1254B. L.M.B. has admitted not having contact with her son since January, 1998. However, she asserts she had just cause because the custody order did not allow visitation. We are not persuaded by this argument. A simple motion to the court is all that was necessary for further hearings regarding visitation.
*191 In her testimony L.M.B. admitted years of substance abuse and criminal activity. She also acknowledged that she did not attend the custody proceedings even though she was aware of the hearing, because she was on drugs and had criminal charges pending against her. She further acknowledged that her substance abuse persisted after the award of custody Into her sister, and stated that the custody arrangement was in her child’s best interest.
L.M.B. avers that she has now overcome her problems and can be a fit mother to her child. However, there is nothing but her self-serving testimony to support that assertion. The only evidence offered in her behalf was testimony of a babysitter who has not seen L.M.B. with her child since January, 1998, and a cousin who now sees her occasionally.
Cases involving the termination of parental rights are among the most weighty actions this Court must consider, and can result in the most dire of consequences. The loss of a right to one’s child is a heavy burden to bear for any parent. We are not without sympathy for a parent in such a situation. However, we have also noted that:
.adults can take years to improve their functioning but that children are not granted the same amount of time, and their lives are significantly disrupted while their parents are attempting to deal with their own problems.
State in Interest of B.K.F., 97-572 (La.App. 5 Cir. 11/25/97), 704 So.2d 314, 320, writ denied, 97-3173 (La.2/20/98), 709 So.2d 779; State in Interest of C.D., 558 So.2d 806, 810 (La.App. 5 Cir.1990); State In Interest of M.P., 538 So.2d 1112, 1116 (La.App. 5 Cir.1989).
By L.M.B.’s admission, she has not been capable of caring for her son since January, 1998 when he was only two-years-old. B.J.B has been with his aunt and uncle for the majority of his life. According to all testimony he is thriving in their care and has bonded with them as a family. Even the maternal grandparents agree that the adoption is in the best interest of the child.
| ^Before rendering judgment, the Juvenile Court took the matter under advisement. When the judgment was rendered, the court gave extensive reasons for the decision. It is clear from those reasons that the court took all of the testimony and evidence into careful consideration. Under the circumstances of this case, we find no error in the Juvenile Court’s finding that there was clear and convincing evidence to support the termination of L.M.B.’s parental rights to B.J.B, and that the adoption of the child by Mr. and Mrs. J.M. was in the best interest of the child. Accordingly, we affirm the judgment.
AFFIRMED.

. We note that the legislature has failed to amend section B of Article 1255 to include siblings of the parent. Thus, we will not apply the rebuttable presumption that the adoption is in the best interest of the child.