884 So.2d 678 (2004)
In re: J.A.B. Applying for Intrafamily Adoption of V.S.M.B.
No. 2004 CJ 1160.
Court of Appeal of Louisiana, First Circuit.
September 17, 2004.
Rehearing Denied November 9, 2004.
*679 J.A.B., River Ridge, Counsel for Plaintiff/Appellee, J.A.B.
Rita K. Akehurst, II, Gretna, Counsel for Defendant/Appellant, L.A.B.
Before: WHIPPLE, FITZSIMMONS, and DOWNING, JJ.
WHIPPLE, J.
On appeal, the biological father, L.A.B., challenges a judgment of the district court granting a petition for intrafamily adoption of the minor child, V.S.M.B., filed by the minor child's stepfather, J.A.B. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
E.B. and L.A.B. were married on August 3, 1996. One child, V.S.M.B., was born of the marriage on September 30, 1999. Due to continuing marital problems, the parties separated in November of 1999 after an incident of domestic violence perpetrated by L.A.B. By virtue of a "Consent Judgment of Divorce," the parties were eventually granted a divorce by the Twenty-First Judicial District Court in Tangipahoa Parish on September 20, 2000.
In the September 20, 2000 consent judgment, the parties agreed to share joint custody of V.S.M.B.; that E.B. be designated as the domiciliary parent "subject to limited visitation in favor of [L.A.B.] to the extent of alternating Saturdays, with visitation limited to that time and under those certain precautions as shall be established and determined by [E.B.]"; and that L.A.B. pay child support in the amount of $500.00 per month retroactive to the filing *680 of the petition for divorce on January 11, 2000.
On April 11, 2001, the parties entered another consent agreement, reduced to judgment in the Tangipahoa Parish proceedings, whereby the parties stipulated to the issuance of reciprocal restraining orders prohibiting the parties from contacting each other in any way for any purpose other than the limited purpose of arranging child visitation or for emergencies involving the minor child. The judgment further provided that retroactive to March 19, 2001, and for a two-year period from that date, L.A.B. waived any right to visitation or contact with V.S.M.B. Given L.A.B.'s agreement not to communicate or make contact with the minor child, E.B. agreed to waive any child support due by L.A.B. during that two-year period. The judgment also contained a "reservation of rights" in favor of both parties, maintaining their joint legal custody of V.S.M.B. as granted by the original consent judgment.
E.B. subsequently married J.A.B. on May 25, 2002 in St. Tammany Parish, where they reside. On February 7, 2003, J.A.B. filed a petition for intrafamily adoption of his step-child, V.S.M.B., in the Twenty-Second Judicial District Court in St. Tammany Parish, the proceedings giving rise to this appeal.
In the petition, J.A.B. alleged that L.A.B. had failed to "visit, communicate or attempt to communicate with the child, without just cause, since on or about March 18, 2001, a period of more than 6 months." Thus, he alleged, pursuant to LSA-Ch. C. art. 1245, the parental consent of L.A.B. was not necessary.[1] L.A.B. filed a petition in opposition to the intrafamily adoption alleging that his lack of visitation with the minor child was of no consequence, given the terms of the April 11, 2001 consent judgment filed in Tangipahoa Parish. He also contended that at the conclusion of the prescribed two-year period, he "made every effort" to visit with the child.
Trial of the matter was held on September 3, 2003, after which the St. Tammany district court rejected his arguments and rendered "Reasons for Judgment" on November 26, 2003, granting the petition for intrafamily adoption filed by J.A.B. A written judgment in conformity with the court's reason was signed on December 16, 2003.
L.A.B. now appeals, claiming that the petition for intrafamily adoption "should not have been granted as it prejudiced the paternal and legal rights of the natural father." The res nova issue presented herein is whether or not a consent judgment rendered by a district court, wherein a parent obtains a waiver of his child support obligation in exchange for his agreement not to visit or communicate with the minor child for two years while preserving the joint custody rights (under the prior consent judgment) may serve as "just cause" excusing the father's failure to "visit, communicate or attempt to communicate with the child, ... [for] a period of more than 6 months," thereby deeming his consent to intrafamily adoption necessary.

DISCUSSION
Generally, a parent's consent is required for an intrafamily adoption. LSA-Ch.C. art. 1193. However, pursuant to LSA-Ch.C. art. 1245, consent of a parent is not *681 necessary if the petitioner proves that the parent has forfeited his right to consent, as follows:
A. The consent of the parent as required by Article 1193 may be dispensed with upon proof of the required elements of either Paragraph B, C, or D of this Article.
B. When a petitioner authorized by Article 1243 has been granted custody of the child by a court of competent jurisdiction and any one of the following condition exists:
(1) The parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
(2) The parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:
(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
(Emphasis added.)
The party petitioning the court for adoption carries the burden of proving a parent's consent is not required under the law. In re Fleming, XXXX-XXXX (La. App. 5th Cir.4/30/02), 817 So.2d 371, 376. To constitute "just cause," a parent's failure to support, visit, or communicate with his children must be due to factors beyond his control. In re RMK, 499 So.2d 190, 192 (La.App. 2nd Cir.10/29/86).[2]
J.A.B. contends that pursuant to LSA-Ch.C. art. 1245(C)(2), L.A.B.'s consent was not necessary because he had refused or failed to visit, communicate, or attempt to communicate with V.S.M.B., without just cause, since on or about March 18, 2001, a period of more than six months. L.A.B. does not dispute that fact that he failed to visit, communicate, or attempt to communicate with V.S.M.B., for a period of more than six months. However, he claims that his failure to do so was justified, given the April 11, 2001 consent judgment entered into in the Tangipahoa Parish proceedings, which, he claims in brief, also reserved his "paternal and legal rights."[3]
While we agree that the reservation of rights provision maintained the joint custody status of V.S.M.B., and preserved the parties' custody arrangement under the prior judgment, L.A.B.'s reservation of his rights to joint custody is not dispositive of *682 the issue of whether his failure to visit, communicate, or attempt to communicate with the child, was legally justified and thus served to preserve the need for his consent to the proposed intrafamily adoption by J.A.B. pursuant to LSA-Ch.C. art. 1245(C)(2).
On review, we specifically reject L.A.B.'s argument that a reservation of his legal rights to joint custody of a child whom he voluntarily agreed not to visit in exchange for a waiver of his monthly child support obligation for a period over two years can serve as "just cause" excusing his failure to visit, communicate, or attempt to communicate with the child for what was, in essence, the majority of the child's life. We further reject his claim that his compliance with the consent judgment, which he argues is tantamount to a contract, served as "just cause" pursuant to LSA-Ch.C. art. 1245(C)(2).
Pretermitting a determination of the legality or validity of the consent judgment entered into by the parties herein[4] (where payment of L.A.B.'s child support obligation was made contingent upon his agreement to waive visitation with V.S.M.B.), we find that L.A.B. voluntarily relinquished his right to see and communicate *683 with his child in return for a financial benefit, i.e., relief from his obligation to provide financial support for his child. A parent's financial benefit cannot constitute "just cause" for failing to visit or communicate with his child.
In sum, we hold that a parent cannot put his parental rights, duties, privileges, and obligations on hold voluntarily and without just cause for a period of two years and then expect to automatically resume those rights and privileges after such a significant period of time in the life of a child has elapsed. As our colleagues noted in State in the Interest of M.P. and B.P., 538 So.2d 1112, 1115 (La.App. 5th Cir. 1989), "while adults can take ... years to... improve their level of functioning... children are not granted the same amount of time to go through developmental stages and a[sic] that a number of years in a child's life can be disrupted significantly, while parents are getting themselves together." We find these principles equally applicable in the instant case. In doing so, we note that child support and visitation issues are subject to modification, considering the circumstances and the best interest of the child.
Here, both E.B. and L.A.B. testified that L.A.B. voluntarily entered into the April 11, 2001 consent judgment and agreed that he would waive visitation with V.S.M.B. in lieu of having to pay the $500.00 monthly child support obligation he had been condemned to pay. Notably, L.A.B. was represented by legal counsel at the time the agreement was confected, and obviously was aware that this "consent judgment" was subject to modification, if he so desired, given the reservation of joint legal custody. Nonetheless, he willingly relinquished his visitation rights strictly for personal economic benefit and gain. While L.A.B. argues in brief that he entered the consent agreement to give E.B. "some time," the record shows that at the time he entered the consent agreement waiving his child support obligation, he owed in excess of $2,000.00 in arrears.[5] His continuous failure to visit or communicate with the child was voluntarily on his part, and due to personal factors within his control. See In re RMK, 499 So.2d 190 (La.App. 2nd Cir.10/29/86).
Accordingly, we find no error in the district court's factual finding that L.A.B. failed to visit or communicate with V.S.M.B. for a period exceeding six months, or in its conclusion that such failure to do so was without just cause. Thus, the trial court correctly ruled that L.A.B.'s consent to the adoption was not necessary.
However, even where the other parent's consent is obviated by failure to visit, the court must also consider what is in the best interest of the child in determining whether the adoption should proceed. In re Miller, 95-1051, 95-1052 (La. App. 1st Cir.12/15/95), 665 So.2d 774, 777, writ denied, 96-0166 (La.2/9/96), 667 So.2d 541. In fact, the primary consideration in adoption proceedings is whether the adoption is in the best interest of the child. In re Miller, 95-1051, 95-1052, 665 So.2d at 777.
Louisiana Children's Code article 1255 provides:
A. The court, after hearing and after taking into consideration information from all sources concerning the intrafamily adoption, may enter a final decree of adoption, or it may deny the adoption. The basic consideration shall be the best interests of the child.

*684 B. When a court has granted custody to either the child's grandparents or his parent married to the stepparent petitioner, there shall be a rebuttable presumption that this adoption is in the best interests of the child.
The courts have recognized that factors must be considered when determining the best interest of the child. The most important factors are the child's relationships with her stepfather and her natural father. It is not enough to examine the love and home environment provided by the petitioner/stepparent. The court must also examine the depth of closeness of the child's ties with the non-custodial natural parent, and the effect which the loss of this relationship would have on the child. Further, the court must consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. Knapp v. Adoption of Cotten, 577 So.2d 241, 246 (La.App. 1st Cir.), writ denied, 580 So.2d 364 (La.1991).
The record shows that in March of 1999, L.A.B. began exhibiting very strange behavior and became very violent and physically abusive towards E.B. L.A.B. began staying up all night and dressing in all white because he said that was what Jesus wore. E.B. further testified in detail regarding several incidents of violence that were perpetrated upon her by L.A.B. L.A.B.'s irrational behavior eventually escalated to the point where his bizarre and violent conduct required his committal to a psychiatric hospital. On March 25, 1999, L.A.B. was committed to Methodist Psychiatric Pavilion in New Orleans.
Dr. M. Kaleem Arshad, a board certified psychiatrist, treated L.A.B. during his stay at the Psychiatric Pavilion. Dr. Arshad gathered L.A.B.'s medical and behavioral history from his family, which revealed increasingly bizarre and inappropriate behavior. He stated that L.A.B.'s family became extremely concerned for their safety as well as for his safety, which prompted them to obtain an order of protective custody and admit L.A.B. to the psychiatric hospital for treatment. At the time of L.A.B.'s admittance, Dr. Arshad gave him a diagnosis of a psychosis "NOS," which stands for "not otherwise specified." He explained that L.A.B. demonstrated a cluster of symptoms that did not meet the specific criteria for any other diagnosis. Dr. Arshad decided to admit L.A.B. and put him on medication to treat some of his psychiatric symptoms. He was eventually able to diagnose L.A.B. as suffering from a schizoid effective disorder, noting his delusional ideas and ideas of grandiosity, and a diagnosis of bipolar disorder. Dr. Arshad felt like the hospitalization in March was brought on in part or contributed to by stress. L.A.B. was discharged from Methodist Psychiatric Pavilion on April 1, 1999. Because stress can always precipitate or be a contributing factor to any future psychotic episode, Dr. Arshad recommended that upon release, L.A.B. follow-up with counseling to help him deal with stress. L.A.B. attended only five follow-up visits with Dr. Arshad after his release. During those visits, his diagnosis remained the same. Dr. Arshad became concerned when L.A.B. informed him that he was not taking the medication as prescribed, which posed an increased risk that similar episodes would occur. On July 22, 2003, L.A.B. last visited Dr. Arshad to obtain his medical records and treatment records from the hospital.
The record shows that later that year, on November 19, 1999, there was an incident at L.A.B. and E.B.'s home wherein L.A.B. became involved in an argument with his sister. E.B., V.S.M.B., and L.A.B.'s nephew and other sister were also *685 present. At the time, V.S.M.B. was only two months old. The argument continued to escalate, and during the course of the altercation with his sister, L.A.B. became physically violent toward his sister, nephew, and E.B. The police were called, and once they arrived, L.A.B. was arrested. As a result of this particular ordeal, E.B. separated from L.A.B. that night. She packed her belongings with the help of L.A.B.'s sisters, and she moved out of the home the next day, taking their infant child with her.
After they separated and divorced, L.A.B. began continuously harassing E.B. Hal Price, a twenty-year employee by the Southeastern University Police Department, testified that L.A.B. had been harassing E.B. at the university, where both E.B. and L.A.B. were employed. In order to address safety concerns, surveillance cameras were installed in E.B.'s office and undercover policemen were assigned to escort E.B. around campus. He testified that he was concerned for E.B.'s safety, particularly more so after interviewing L.A.B. Because of L.A.B.'s behavior and the real threat that he posed to E.B. on campus, L.A.B. was eventually asked to resign from his employment with the University.
L.A.B. admitted that he has had no relationship with V.S.M.B., and that he has only seen her at the time she was an infant. He last saw her on March 17, 2001. No one in L.A.B.'s family has seen V.S.M.B. since that date. Moreover, V.S.M.B. has never had any relationship with L.A.B. since and has never received any cards, phone calls, or gifts from L.A.B. or any members of his family.
Contrariwise, J.A.B. is known to V.S.M.B. as her "daddy" and they share a very close and loving relationship. Undisputedly, she has never known anyone to be her father other than J.A.B. Furthermore, the testimony establishes that V.S.M.B. has a very close and loving relationship with J.A.B.'s immediate family, that V.S.M.B. considers J.A.B.'s parents to be her grandparents, and views his sister as her aunt. She is also very close to her cousins in J.A.B.'s family.
Dr. Karen Van Beyer, a licensed clinical social worker, was accepted by the court as an expert in child custody evaluations and social work. Dr. Van Beyer testified that she reviewed L.A.B.'s psychiatric records, and interviewed and observed V.S.M.B. in her home with J.A.B. and E.B. She concluded that V.S.M.B. was a normal, happy, well-adjusted little girl, who had a very positive, secure attachment to her step-father. She witnessed no evidence of any kind of disorder such as separation anxiety. The most important thing she observed was the very positive attachment V.S.M.B. had to both her mother and step-father. She stated that V.S.M.B. refers to J.A.B. as "daddy," and that V.S.M.B. believes that J.A.B. is her father. Dr. Van Beyer also observed that J.A.B. is V.S.M.B.'s psychological father. She defined a "psychological father" as the person with whom the child has the very deep and primary attachment that is going to form the basis of an internal working model. The internal working model is the pattern formed by a person as a very small child, which determines how the individual will relate to other people for the rest of his life.
The record shows that L.A.B. voluntarily entered the agreement not to visit or communicate with V.S.M.B. for two years in return for economic benefit and personal gain. As a result, he willingly sacrificed any potential relationship that could have been formed with his daughter during the formative years of her life. Thus, his daughter does not recognize nor know him at all, much less view him as her father. *686 Instead, the only person she knows as "daddy" is her stepfather, J.A.B., who has provided for her physical, financial and emotional well-being, and who clearly appears to love her very much.
While the courts must consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent, the record establishes that L.A.B. had no relationship whatsoever with V.S.M.B. See Knapp, 577 So.2d at 246. Moreover, considering the effect which the loss of this relationship would have on the child, the loss of any potential relationship with L.A.B. would have no effect on this child, inasmuch as V.S.M.B. does not know L.A.B. See Knapp, 577 So.2d at 246.
In lengthy and thorough reasons for judgment, the district court concluded that it was in the best interest of the child for the adoption to take place. Taking into consideration the relationship of the child with J.A.B. and L.A.B., the district court stated:
The testimony at trial revealed that [V.S.M.B.] has had a close relationship with [J.A.B.] and his family since December of 2000. She has lived with [J.A.B.] since 2002. He is the only "Daddy" she knows. Additionally, [V.S.M.B.] regards [J.A.B.]'s parents as her grandparents and knows his siblings as her aunts and uncles. The evidence presented was of a close, loving family.
[L.A.B.] has had almost no contact with [V.S.M.B.] since November, 1999. The Court notes this was voluntary on [L.A.B.]'s part. He rarely exercised visitation and was in arrears in his child support. In April, 2001, he voluntarily relinquished his right to visitation in exchange for the waiver of his child support obligation. The testimony established a lack of a relationship with [V.S.M.B.] on the part of [L.A.B.] or his family.
There was also evidence presented at trial of [L.A.B.]'s disturbing and threatening behavior towards [E.B.]. Both [L.A.B.] and [E.B.] were employed at Southeastern University in Hammond. [E.B.] testified that in November, 2002, [L.A.B.] began conduct which she characterized as "harassing". [L.A.B.] was released from his employment at Southeastern University after a police investigation of his actions towards [E.B.].
The Court having considered the evidence, the testimony adduced at trial and the memoranda of law submitted by counsel, finds it in the best interest of the child to grant the adoption of [V.S.M.B.] by [J.A.B.] thereby changing her name to [V.S.M.B.].
As a reviewing court, we may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact's findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
We have thoroughly reviewed the record, and considering the facts and evidence presented, we find the evidence overwhelmingly *687 supports the conclusion of the trial court that the proposed adoption was in the minor child's best interest. Thus, we find no error in the district court's judgment granting the intrafamily of V.S.M.B. by J.A.B.

CONCLUSION
Based on the above and foregoing reasons, the December 16, 2003 judgment of the district court, granting the petition for intrafamily adoption of V.S.M.B. by J.A.B., is affirmed. Costs of this appeal are assessed against the appellant, L.A.B.
AFFIRMED.
DOWNING, J., concurs with reasons.
FITZSIMMONS, J., concurs in the result only.
DOWNING, J., concurs and assigns reasons.
I concur in the result. The terms of the judgment itself suggest that LAB would not face contempt proceedings if he attempted to communicate with his child during the prohibited two-year period. Rather, his apparent penalty would be the resumption of child support payments. He clearly chose nonpayment of child support over communication with his child. Saving money cannot constitute "just cause" for failing to visit or communicate with his child.
I disagree with the opinion, however, in its sweeping language rejecting outright any claim that compliance with a consent judgment cannot provide just cause pursuant to La. Ch.C. art. 1245(C)(2).
Properly confected consent decrees affecting child support are enforceable. In Richardson v. Richardson, 02-2415 (La. App. 1 Cir. 7/9/03), 859 So.2d 81, we held that a consent waiver of the ability to modify child support would be enforced unless the agreement was contrary to the child's best interest or in derogation of the public order. In Stogner v. Stogner, 98-3044, p. 9 (La.1999), 739 So.2d 762, 768, the Louisiana Supreme Court specifically declined to abrogate "that body of law which has recognized that a consent (stipulated) judgment is by its nature a bilateral agreement between the parties wherein the parties adjust their differences by mutual consent and thereby put an end to a lawsuit with each party balancing the hope of gain against the fear of loss." Therefore, once a consent decree is properly confected, a party may no longer have control over the contents and may be subject to contempt proceedings if he or she fails to comply.
Stogner now controls consent decrees for child support. Stogner instructs us that La R.S. 9:315.1D provides a two-step process for the trial court to follow in initially approving stipulated child support judgments. First, upon presentation, it may review and approve or categorically reject stipulated provisions relating to child support. Stogner, 98-3044 at p. 8, 739 So.2d at 767. Second, if it does not reject the stipulation in favor of the child support guidelines, the trial court must "`consider the guidelines ... to review the adequacy of the stipulated amount.'" Id.
Under Stogner, it appears the trial court perhaps should never have signed the consent judgment. I disagree with the assertion, however, that compliance with a consent decree, which is a valid order of a court until vacated, can never constitute just cause for failure to visit, communicate or attempt to communicate with a child. Noncompliance with a court order is grounds for contempt. And there may be circumstances in which court ordered non-communication with a child for extended periods might be justified. Such rulings should be on a case-by-case basis by the trial court.
*688 Accordingly, a properly confected consent decree where custodial rights are preserved could be enforceable, and compliance with a judicial decree could constitute just cause for not visiting or communicating with a child.
Additionally, while a parent may file a motion to amend custody at any time, he or she has the burden of showing both a change in circumstance materially affecting the welfare of the child and that the change is in the best interest of the child. R.J. v. M.J., 03-2676, p. 6 (La.App. 1 Cir. 5/14/04), 880 So.2d 20, 25. So it seems a facile argument to suggest that a parent can change a court ordered custody arrangement at any time.
Even so, I agree that LAB's consent to the adoption is unnecessary under the facts before us and that the adoption is in the best interest of the child. Accordingly, I concur in the result.
NOTES
[1] Louisiana Children's Code article 1245(C)(2) provides that when the spouse of a stepparent petitioner has been granted joint custody of the child and the other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months, the other parent's consent to the adoption is not necessary or required.
[2] For example, a parent's incarceration is not "just cause" for failing to pay support or communicate with the child. In re Fleming, XXXX-XXXX (La.App. 5th Cir.4/30/02), 817 So.2d 371, 376. Also, where a mother failed to pay child support in the amount of $61.25 per month, but received social security income of $484.00 per month, mother's non-payment of court-ordered child support was deemed to be without just cause. In re D.R.S. and J.A.S., 98-237 (La.App. 5th Cir.8/25/98), 717 So.2d 1259, 1261-1262.
[3] Specifically, the April 11, 2001 consent judgment states: "that the agreement reached by the parties shall be subject to non-prejudicial reservation of rights in favor of both parties insofar as the current Consent Judgment granting both parties joint legal custody of the minor ...." (Emphasis added.)
[4] In Macaluso v. Macaluso, 509 So.2d 201 (La.App. 1st Cir.1987), this court was faced with an agreement similar to the one herein, where visitation was made contingent upon payment or nonpayment of child support. Another panel of this court was asked to consider the validity of a consent judgment that contained a provision making the payment of child support contingent upon the child complying with the visitation ordered. This court determined that the provision was clearly against public policy and was absolutely null on its face, Macaluso, 509 So.2d at 202, reasoning that:

[t]he public policy behind a parent's duty of support is to ensure, both for the sake of the child and the sake of the general public which might otherwise have to provide his support, that each child receives support significant for his maintenance and upbringing. Further, the duty of support owed by a parent to a minor child is unilateral in nature and arises by the mere fact of paternity. It is well-established that a parent is not justified in failing to pay support, even when there has been a denial of visitation privileges. The payment of child support can not be made contingent upon the child agreeing to comply with visitation, as was done in this case, because support is not a duty that a parent owes in exchange for visitation. A parent's duty of support arises entirely independent of any issue of visitation privileges, merely by virtue of the child's paternity. (Citations omitted.)
The Macaluso court concluded that enforcement of the provision making the payment of child support contingent on visitation was "clearly ... repugnant to the public policy behind a parent's duty of support." Macaluso, 509 So.2d at 203.
Appellate courts in other states have followed Macaluso by similarly holding that child support payments and visitation rights may not be made dependent on one another. See Scott v. Rutherfoord, 2001 WL 1768943 (Va.Cir.Ct.3/1/01). In Scott, where the non-custodial parent entered into a written agreement with the custodial parent wherein he agreed to pay the custodial parent $10,000.00 per month "if both children complete all visitation as agreed in this agreement for the preceding month," the court found that the agreement therein amounted to an arrangement whereby the non-custodial parent pays for visitation rights. Scott, 2001 WL 1768943 at p. 2. The Scott court concluded that "[a]n agreement linking the payment of child support to visitation violates public policy and cannot be enforced." Scott, 2001 WL 1768943 at p. 5.
In Carter v. Carter, 198 W.Va. 171, 479 S.E.2d 681 (11/18/96), where the trial court reduced the amount of child support arrearages to punish the custodial mother for discouraging visitation between the father and the parties' two children, the appellate court reversed the decision of the trial court, finding that "[j]ust as visitation privileges are not to be conditioned upon the payment [or non-payment] of child support, a parent's duty to pay child support likewise may not be made contingent upon that parent's exercise of visitation privileges." Carter, 198 W.Va. at 177, 479 S.E.2d at 687. (Citations omitted.)
[5] The child support obligation was ordered retroactive to the date of the filing of the petition. As such, L.A.B. originally owed $4,500.00 in arrears.